USCA No. 24-1311


UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


UNITED STATES,
Appellee

v.

MARK ANTHONY FIGUEROA,
Defendant - Appellant


ON APPEAL FROM JUDGMENT OF CONVICTION IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


BRIEF OF APPELLANT


DAVID J. NATHANSON
First Circuit Bar No. 81606
JELLISON & NATHANSON, LLP
55 Union Street, 4th Floor
Boston, MA 02108
(617) 248-1806
dnathanson@JNdefense.com


March 17, 2025          ATTORNEY FOR DEFENDANT
                        MARK ANTHONY FIGUEROA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

REQUEST FOR ORAL ARGUMENT ...................................................... vi

STATEMENT OF JURISDICTION ........................................................ 1

ISSUES PRESENTED ........................................................................... 2

STATEMENT OF THE CASE .................................................................. 3

STATEMENT OF FACTS ....................................................................... 3

    I.    The Alleged Conduct: Cash Transactions ................................... 3

    II.   The Informants ................................................................. 9

    III.  The Monitored Meeting ............................................................ 13

    IV.  Figueroa's Phone Contents ........................................................ 13

    V.   Lack Of Direct Evidence Of Drug Trafficking ......................... 15

SUMMARY OF ARGUMENT ................................................................ 16

ARGUMENT ........................................................................................ 17

    I.    The trial judge erred in admitting irrelevant and highly
        prejudicial evidence regarding the Sinaloa drug cartel,
        kidnapping, and torture.. ........................................................ 17

        A. Background & Legal Standard............................................. 17

        B. The judge abused his discretion in admitting dramatic and
           irrelevant testimony that the cooperating witness had been
           kidnapped and tortured by the Sinaloa drug cartel............ 19

        C. The error was not harmless.................................................. 20

II.    The trial judge erred in allownig overview and ultimate issue testimony from law enforcement witnesses. ............................. 28

    A. Special Agent O'Shaughnessy offered impermissible overview testimony. ................................................................ 28

    B. Officer Hernandez's inadmissible, conclusory testimony. ... 30

    C. Forensic auditor Lauren George's testimony suffered from the same issues. ...................................................................... 32

    D. The inadmissible law enforcement testimony prejudiced Figueroa ................................................................................... 32

CONCLUSION ........................................................................... 37

CERTIFICATE OF COMPLIANCE ........................................... 38

CERTIFICATE OF SERVICE ................................................... 39

ADDENDUM ........................................................................ Add.1

# TABLE OF AUTHORITIES

**Cases**

*Rosales-Mireles v. United States,*
   585 U.S. 129 (2018) ........................................................................ 36, 37

*State v. Washington,*
   438 A.2d 1144 (Conn. 1980) ................................................... 27

*United States v. Ayala-Garcia,*
   574 F.3d 5 (1st Cir. 2009)....................................................... 22

*United States v. Baptiste,*
   8 F.4th 30 (1st Cir. 2021) ...................................................... 33

*United States v. Canty,*
   37 F.4th 775 (1st Cir. 2022) ............................................. 35, 36

*United States v. Caraway,*
   534 F.3d 1290 (10th Cir. 2008) ............................................. 33

*United States v. Casas,*
   356 F.3d 104 (1st Cir. 2004).............................................. 18, 34

*United States v. Cristerna-Gonzalez,*
   962 F.3d 1253 (10th Cir. 2020) ............................................. 20

*United States v. Echavarria-Olarte,*
   904 F.2d 1391 (9th Cir. 1990) ............................................... 20

*United States v. Flores–de–Jesús,*
   569 F.3d 8 (1st Cir. 2009)....................................................... 28

*United States v. Jadlowe,*
   628 F.3d 1 (1st Cir. 2010)........................................... 26, 27, 37

*United States v. Mahone,*
   453 F.3d 68 (1st Cir. 2006).................................................... 18

*United States v. Manning,*
23 F.3d 570 (1st Cir. 1994)..................................................... 22

*United States v. McGauley,*
279 F.3d 62 (1st Cir. 2002)..................................................... 18

*United States v. Meises,*
645 F.3d 5 (1st Cir. 2011)...................................... 23, 28, 33, 36

*United States v. Pereira,*
848 F.3d 17 (1st Cir. 2017)..................................................... 33

*United States v. Rodriguez-Adorno,*
695 F.3d 32 (1st Cir. 2012).............................................. 28, 31

*United States v. Rosario-Pérez,*
957 F.3d 277 (1st Cir. 2020)................................................... 35

*United States v. Sanabria,*
645 F.3d 505 (1st Cir. 2011)........................................... 31, 33

*United States v. Sepúlveda,*
15 F.3d 1161 (1st Cir. 1993)................................................... 33

*United States v. Solís-Vásquez,*
10 F.4th 59 (1st Cir. 2021) .................................................... 35

*United States v. Vázquez-Rivera,*
665 F.3d 351 (1st Cir. 2011)...................... 28, 29, 30, 31, 32

*United States v. Villa-Guillen,*
102 F.4th 508 (1st Cir. 2024) ............................................... 18

## Statutes

18 U.S.C. § 1956(h)................................................................. 3

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3742 .................................................................. 1

28 U.S.C. § 1291 .................................................................. 1

## Rules

Fed. R. App. P. 34(a) ........................................................... vi

Fed. R. Crim. P. 24(c)(3) .................................................... 26

Fed. R. Evid. 103(b) ............................................................ 18

Fed. R. Evid. 401 ................................................................. 19

Fed. R. Evid. 403 ................................................................. 20

Fed. R. Evid. 701(b) ............................................................ 31

First Cir. R. App. P. 34(a) .................................................. vi

## Request for Oral Argument

Pursuant to Fed. R. App. P. 34(a) and First Cir. R. 34(a), Appellant Mark Figueroa respectfully requests oral argument. This case involves fact-specific arguments regarding whether inadmissible testimony infected the entire case and whether - in a case that was fairly weak - the prejudice from those errors was exacerbated by an improper jury instruction which this Court has warned this specific trial judge not to give. Oral argument would assist the Court.

# Statement of Jurisdiction

This is a direct appeal from a judgment in a criminal case entered by the United States District Court for the District of Massachusetts. That Court exercised jurisdiction under 18 U.S.C. § 3231. This Court's appellate jurisdiction rests upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

On March 20, 2024, Mr. Figueroa was sentenced to 120 months' incarceration, followed by three years of supervised release. R.A.12.[1] The judgment entered on March 22, 2024. Add.4. A timely notice of appeal was filed on April 1, 2024. R.A.529.

---

[1] The record appendix is cited herein as "R.A.[page]." The addendum to the brief is cited as "Add.[page]." The trial transcripts are cited as "Tr. [Vol.]:[page]," and the final pretrial conference transcript is cited as "PTC Tr.[page]."

## Issues Presented

I.    Whether inflammatory and irrelevant evidence that created sympathy for the cooperating witness whose credibility was essential to the government's case and promoted guilt by association requires a new trial.

II.    Whether improper overview testimony, incorporating conclusory statements regarding the defendant's relationship with cartel members, hearsay, and the imprimatur of the government, as well as improper lay opinion testimony, cumulatively require reversal.

## Statement of the Case

On November 10, 2021, a grand jury returned an indictment against Figueroa alleging one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). R.A.14; Docket no. 21-cr-10333-RGS.

A jury trial was held from March 27 to March 30, 2023 (Stearns, J., presiding). The jury convicted Figueroa of the charged offense. R.A.528. Following a sentencing hearing held on March 20, 2024, Figueroa was sentenced to 120 months imprisonment, followed by three years of supervised release. R.A.12. The judgment entered on March 22, 2024, and Figueroa filed a timely notice of appeal on April 1, 2024. R.A.529.

## Statement of Facts

### I.    The Alleged Conduct: Cash Transactions

At trial, the government elicited descriptions of six incidents involving large cash transactions connected to Figueroa.

First, on February 27, 2019, agents surveilling Figueroa's home saw him leave at around 10:44 a.m. carrying a brown duffel bag. Tr.1:57 (R.A.73). Agents then followed Figueroa to the Yotel Boston Hotel, where he entered with the duffel bag. Tr.1:57–58 (R.A.73–74). Agents saw him meet with a person in the lobby area, then take the elevator to the third

floor.[2] Tr.1:58 (R.A.74). After the meeting, he left the area. Tr.1:59 (R.A.75). The person that Figueroa met with then went to a Bank of America and deposited $80,010 in cash with a bank teller. Tr.1:60–61 (R.A.76–77). Agents compared surveillance video from the Yotel with video from the Bank of America and found the person who met with Figueroa was the same person who deposited the money. Tr.1:61 (R.A.77). He was identified as Alfredo Vidal-Ibarra. Tr. 1:61 (R.A.77).

Second, on the morning of March 15, 2019, agents saw Mr. Figueroa leave his house and go to terminal C at Logan Airport. Tr.1:69–70 (R.A.85–86). He boarded a plane to Orlando, Florida. Tr.1:70 (R.A.86). HSI agents in Florida received information that there was going to be a money drop and pickup on March 16, 2019. Tr.2:62 (R.A.239). Agents were informed that the courier would be wearing a red shirt and carrying a backpack with an attached cylindrical bag. Tr.2:65 (R.A.242). Agents went to a Kohls parking lot and observed a pickup truck, driven by Figueroa. Tr.2:64–66 (R.A.241–43). A silver minivan pulled up and a man in a red shirt with the described backpack got out of the passenger's side. Tr.2:67 (R.A.244). He entered Figueroa's pickup truck. Tr.2:67 (R.A.244).

---

[2] Agents also obtained security footage from the hotel. Tr.1:59 (R.A.75).

They circled the parking lot, then parked. Tr.2:67 (R.A.244). At some point, the man with the red shirt entered Kohls, where he stayed for about ten minutes, then exited the store with a shopping bag. Tr.2:68 (R.A.245). He re-entered the pickup truck, the men talked, then they left the parking lot and drove to a Dunkin' Donuts, which was near a Bank of America. Tr.2:68–69 (R.A.245–46). The man with the red shirt walked to Bank of America. Tr.2:69 (R.A.246). Figueroa then drove away; once he made a series of U-turns, surveillance was terminated. Tr.2:70 (R.A.247).

Third, on April 18, 2019, agents saw Figueroa leave his home around 1:30 p.m. Tr.1:74 (R.A.90). Police believed, based on information received from a cooperator, Pedro Magana, that Figueroa was going to be giving money to a courier that day, and so they arranged for a vehicle stop. Tr.1:74–75 (R.A. 90–91). The trooper stopped Figueroa while he was driving, and recovered a box with $100,050 inside. Tr.1:75, 2:163 (R.A.91, 340). Figueroa told the officer that the money was from his restaurant.

Tr.2:160, 162 (R.A.337, 339). The police seized the money. Tr.2:162 (R.A.339).[3]

Fourth, on October 1, 2019, agents set up surveillance across the street from Figueroa's restaurant, JPizle. Tr.1:79 (R.A.95). At around 1:15 p.m., Figueroa left his house with a black backpack that had a red pouch. Tr.1:80 (R.A.96). He entered JPizle at around 1:20 p.m.; about a minute later, agents saw Ricardo Valenzuela-Gale approach the area. Tr.1:81 (R.A.97). Valenzuela-Gale sat on a bench in front of JPizle, and he appeared to be texting. Tr.1:81 (R.A.97). Minutes later, Figueroa, speaking on his cell phone, sat next to Valenzuela-Gale on the bench. Tr.1:82 (R.A.98). Valenzuela-Gale pulled a folded bill from his pocket and handed it to Figueroa. Tr.1:82 (R.A.98). Figueroa hung up his phone call, examined the bill, looked at his phone, then at the bill again, then put the bill in his pocket. Tr.1:82 (R.A.98). He and Valenzuela-Gale entered JPizle together. Tr.1:82 (R.A.98). A few minutes later, at 1:31 p.m., Figueroa and Valenzuela-Gale left JPizle. Tr.1:83 (R.A.99). Figueroa was wearing a black hooded sweatshirt and was carrying the gray backpack

---

[3] Lauren George, an auditor with the U.S. Attorney's Office, testified that past individual deposits into the restaurant's business bank account were never in excess of $7,000. Tr.2:65 (R.A.416).

Valenzuela-Gale had worn into the restaurant. Tr.1:83 (R.A.99). Valenzuela-Gale was carrying the black backpack with a red pouch. Tr.1:83 (R.A.99). They went to Bank of America, and bank records reflect two deposits totaling $109,800. Tr.1:84, 1:90 (R.A.100, 106).

Fifth, on April 16, 2020, investigators received information from the DEA Financial Investigations Team that there would be a money pickup at JPizle around midday. Tr.1:90–91 (R.A.106–07). Prior to the pickup, undercover agents had phone contact with Magana and with Figueroa, who provided a verbal code to confirm the pickup. Tr.3:21 (R.A.372). The day of the drop, Figueroa left his residence around 11:40 a.m. with his dog and walked towards JPizle. Tr.1:92–93 (R.A.108–09). Agents sought to do the money transfer outside the restaurant, but Figueroa insisted on doing it inside. Tr.3:23–26 (R.A.374–77). At around 12:07 p.m., undercover agents entered JPizle. Tr.1:93 (R.A.109). When inside, Figueroa counted out bundles of $10,000 cash until he reached $100,000. Tr.3:27 (R.A.378). He and the agents discussed that Figueroa sometimes did business with Chinese individuals, by which the agents believed he meant money laundering business. Tr.3:27–29 (R.A.378–80). The agents discussed that it has been "hard to find merchandise[.]" Tr.3:30 (R.A.381).

Figueroa responded in Spanish that he has no issues, because he is "the factory." Tr.3:30 (R.A.381). Agent Hernandez asked him if he works with "perico", which can be used as a slang term for cocaine; Figueroa responded, "with everything." Tr.3:31 (R.A.382). Agents left the restaurant about four minutes after they entered; one of them was holding a plastic bag that contained $101,000 in cash. Tr.1:94 (R.A.110).

Finally, on May 1, 2020, a pole camera outside JPizle recorded a woman exiting a nearby laundromat, carrying a bag and wearing a medical mask. Tr.1:97 (R.A.113). Figueroa was captured on the pole camera arriving outside JPizle at around 2:30 p.m. with a bag and his bicycle. Tr.3:11 (R.A.362). The woman entered the JPizle restaurant at around 2:30. Tr.1:97, 3:12 (R.A.113, 363). She then exited the restaurant at around 3:12 p.m. and approached a black Mazda, and placed the white plastic bag in its trunk, then entered the rear passenger seat of the car. Tr.1:98, 3:13 (R.A.114, 364). Police arranged a motor vehicle stop of the Mazda. Tr.1:98, 3:13 (R.A.114, 364). A trooper stopped the vehicle and learned it was an Uber rideshare car. Tr.1:133 (R.A.149). The woman was identified as Leslie Nunez. Tr.1:133 (R.A.149). She denied ownership of

the bag in the trunk. Tr.1:137 (R.A.153). The bag was searched, and it contained slightly over $109,000. Tr.1:99, 3:14 (R.A.115, 365).

On December 11, 2021, Figueroa was arrested. Tr.1:99, 101 (R.A.115, 117). After he was Mirandized, police asked him about his meetings with couriers to deliver cash; he "flatly denied" doing so. Tr.1:100–01 (R.A.116–17).

## II.   The Informants

A cooperating witness, Pedro Magana, testified at trial. Magana had opened his own "casa de cambio" or "exchange house", where he exchanged U.S. dollars for Mexican pesos, and vice versa. Tr.1:149, 152 (R.A.165, 168). Magana met Frank Cruz, who lived in Culiacan, Sinaloa, Mexico. Tr.1:152–53 (R.A.168–69). Cruz wanted Magana to receive his dollars, exchange them, and wire them to one of his accounts. Tr.1:154 (R.A.170). Magana believed Cruz was transporting drug money. Tr.1:156 (R.A.172). Magana began having friends pick up money in the United States, deposit the money in U.S. banks, then wire the money to Mexico and to the Culiacan account. Tr.1:158, 2:3–4 (R.A.174, 180–81). Magana recruited other couriers who could operate in the U.S. Tr.2:5 (R.A.182). Cruz would contact Magana with a location in the U.S. where money had

to be picked up, and Magana would send a courier. Tr.2:8 (R.A.185). Magana would connect the courier with the person dropping off the money by having the courier provide the serial number of a dollar bill. Tr.2:9 (R.A.186). Magana would give that information to the customer; then, at the time of the money drop, the courier would hand the bill to the customer, who would check the serial number against the one provided by Magana Tr.2:9 (R.A.186). Magana would also provide information on what the courier was wearing to the customer. Tr.2:12 (R.A.189). Once the courier got the money, he would deposit it in Bank of America, then the money would be transferred to a Mexican account, then to an account operated by Cruz or one of his associates. Tr.2:12–13 (R.A.189–90).

In August 2018, before the charged conspiracy began, [4] law enforcement seized roughly $300,000 from Magana's courier. Tr.2:14–15 (R.A.191–92). Cruz was very angry, and Magana feared for his life. Tr.2:15 (R.A.192). He sought help from agents at the U.S./Mexican border, but the agents told him to go back to Culiacan and "face the consequences"

---

[4] The indictment alleges that Figueroa was engaged in a money laundering conspiracy from February 2019 until May 2020. R.A.14.

of the situation. Tr.2:15–16 (R.A.192–93). Magana was taken to a security house, then to a rural ranch area, and was handcuffed and beaten with a board, and Cruz's "boss or customer", Rojo, attempted to get money from him, but failed in doing so because Magana did not own his own home or cars. Tr.2:17–19 (R.A.194–96). Further detail regarding this incident is in the body of the brief at pages 17–23. They told him Magana would have to work off the debt. Tr.2:19 (R.A.196). Magana went back to the border and the agents told him he would have to inform of any trip, and everything related to his business. Tr.2:19–20 (R.A.196–97). He sent agents flight information, phone numbers, serial numbers, outfits of the couriers, and all other information about the planning of money drops. Tr.2:20–21 (R.A.197–98). There was evidence that Magana and Figueroa corresponded before several of the money drops, and Magana gave the agents details about some upcoming drops. Tr.1:56–57 (R.A.72–73) (Magana and Figueroa had contact around February 27, 2019, drop); Tr.1:69 (R.A.85) (Magana gave information prior to March 2019 drop in Florida); Tr.1:74 (R.A.90) (Magana and Figueroa had contact around April 18, 2019, drop); Tr.1:78–79 (R.A.94–95) (Magana

gave agents information in September 2019 regarding Ricardo Valenzuela-Gale).

Cruz provided a phone number the government contended was Figueroa's to Magana for money pickups. Tr.2:53 (R.A.230).

In exchange for his cooperation, Magana and his wife were able to stay in the United States legally. Tr.2:34, 48 (R.A.211, 225). He was charged with conspiracy to commit money laundering, had not yet pleaded guilty, but "hope[d] for the best" as a result of his cooperation. Tr.2:50–51 (R.A.227–28).

Another unnamed informant mentioned Figueroa to his federal handler. Tr.2:120 (R.A.297). His handler, Special Agent Daniel Lundberg, monitored a recorded phone call between the informant and who he alleged to be Figueroa. Tr.2:123–24 (R.A.300–01). The two discussed drugs and the price of narcotics on the recorded call. Tr.2:126–136 (R.A.303–13). The phone number used was different from the number agents had previously tied to Figueroa, and it appeared initially like those on the phone might not be familiar with each other. Tr.2:142, 145 (R.A.319, 322).

### III.  **The Monitored Meeting**

Bedford Police Officer Alex Hernandez testified about posing as a money courier and picking up cash from Figueroa at JPizle restaurant. The police tried to convince Figueroa to give them the cash outside; he refused. Tr.3:23–26 (R.A.374–77). The police went into the restaurant, and Figueroa counted out bundles of cash. Tr.3:27 (R.A.378). He mentioned that he had done business with Chinese individuals. Tr.3:27–29 (R.A.378–80). Figueroa handed the undercover officers the bag of cash and then instructed them where to find local banks. Tr.3:30 (R.A.381). Hernandez told Figueroa that it's been hard to find merchandise, by which he meant drugs. Tr.3:30 (R.A.381). They laughed together and Figueroa stated, "suela factoria," meaning "I'm the factory." Tr.3:30–31 (R.A.381–82). Hernandez asked him "what do you work with, perico?" Tr.3:31 (R.A.382). He testified that to him, "perico" was a slang term for cocaine. Tr.3:31 (R.A.382). Figueroa responded, "con todo," meaning "with everything." Tr.3:31 (R.A.382).

### IV.  **Figueroa's Phone Contents**

Figueroa's phone contents were downloaded twice during border searches after international travel. Tr.1:51 (R.A.67). Auditor Lauren

George, of the United States Attorney's Office, testified that there were images of FedEx tracking numbers on the phone, which led police to subpoena FedEx. Tr.3:73 (R.A.424). Police learned that the shipments linked to those tracking numbers were going from Arizona to Boston, and Boston to Arizona. Tr.3:73 (R.A.424).

George testified that a package containing drugs was sent to Harvard University. Tr.3:74–75 (R.A.425–26). The FedEx employee who delivered the package was Lennon Carrasco. Tr.3:75 (R.A.426). Carrasco agreed to cooperate, and as a result of his cooperation, a package containing drugs was seized from his colleague Dorian Rojas.[5] Tr.3:77–78 (R.A.428–29). There was no evidence that the tracking numbers for these packages were included on Figueroa's phone. Figueroa's phone contained shipping information for packages that had a common sender as some of these other suspicious packages. Tr.3:85–86 (R.A.436–37).

Figueroa's phone contained a photo of a list of deliveries for a certain date from the company that Carrasco and Rojas worked for, which contracted with FedEx. Tr.3:79 (R.A.430). The government was unsure if

[5] Figueroa's phone showed he had communication with Dorian Rojas, but the government did not allege this occurred around the time of the package deliveries or seizures. Tr.3:78 (R.A.429).

Carrasco and Rojas were still working there at that time. Tr.3:79 (R.A.430).

A message thread on Figueroa's phone that the government contended was with Joaquin Coboj-Acosta[6] included a photo of a bag of pills. Tr.3:87 (R.A.438). Coboj-Acosta had sent the photo to Figueroa. Tr.3:87 (R.A.438). There was some later discussion about price. Tr.3:89–90 (R.A.440–41).

## V.  <u>Lack Of Direct Evidence Of Drug Trafficking</u>

Over the course of an over four year investigation performed by officers from multiple agencies, the police used confidential informants, undercover operatives, physical and electronic surveillance, pole cameras at Figueroa's home and business, subpoenas for search warrants, cell phone tracking, GPS tracking of Figueroa's vehicles, and phone tolls. Tr.1:49–51, 102–04 (R.A.65–67, 118–20). Drugs were never purchased from Figueroa, agents never seized drugs from him, never saw drugs delivered to him, and never saw Figueroa possess drugs or deliver drugs to anyone else. Tr.1:102–09 (R.A.118–25).

---

[6] The government claimed Coboj-Acosta was a drug supplier. Tr.1:53 (R.A.69). His name appears in some transcripts as Coboj-Acosto and Cobo-Acosta, but he will be referred to as Coboj-Acosta for consistency.

## Summary of Argument

The trial judge erred in allowing the government's cooperating witness to describe his kidnapping, beating, and torture by drug cartel members over objection. The parties agreed this incident was wholly unrelated to Figueroa. The probative value of this testimony was minimal, but the unfair prejudice was severe. A jury instruction allowing the jury to discuss the case prior to deliberations (which this Court has explicitly prohibited) and the government's closing argument exacerbated the prejudice. (*Infra* at 17–27).

Several of the government's law enforcement witnesses gave conclusory, prejudicial testimony, including prohibited overview witness testimony. The government's first witness testified to hearsay and matters that he had no direct knowledge of and he also bolstered the testimony of upcoming witnesses. Two other witnesses offered conclusory testimony on the ultimate issue. The cumulative effect of these errors, preserved and unpreserved, demands a new trial. (*Infra* at 28–37).

# Argument

**I. The trial judge erred in admitting irrelevant and highly prejudicial evidence regarding the Sinaloa drug cartel, kidnapping, and torture.**

Though there was no evidence that Figueroa was a cartel member, the cloud of the Sinaloa drug cartel hung over his trial. The government elicited evidence that their cooperator, Magana, had been kidnapped, beaten, and threatened by cartel members in Mexico months before the charged conspiracy began. The parties agreed that Figueroa was not involved in this misconduct. The government used this irrelevant evidence to evoke sympathy for Magana, to enhance his credibility, and to suggest guilt by association. Further, the government stretched the evidence in its closing argument to attempt to associate Figueroa with this misconduct. This Court should reverse.

## A. Background & Legal Standard

At the pretrial hearing, the government foreshadowed that its cooperating witness would testify "about his experience being kidnapped by the drug cartel." PTC Tr. 27 (R.A.27). The Court ruled, "I think a witness can tell his or her own story as long as it's relevant to what we are doing. It sounds like it might be a kind of Breaking Bad interest in

the testimony as it unfolds." PTC Tr. 27 (R.A.27). Defense counsel stated his belief that the proffered testimony was irrelevant. PTC Tr. 27 (R.A.27). The judge replied that he would simply give a curative instruction that there is no allegation that the defendant was involved in a plot to kidnap anyone. PTC Tr. 27–28 (R.A.27–28). The government agreed that there is no allegation that Figueroa was involved in this conduct. PTC Tr. 28 (R.A.28).

Because the judge ruled definitively that the evidence of kidnapping was admissible even though it was unrelated to Figueroa, the issue is preserved. Fed. R. Evid. 103(b); *United States v. Mahone*, 453 F.3d 68, 70 (1st Cir. 2006) (evidentiary objection raised in limine not renewed at trial, issue preserved, pre-trial ruling was definitive); *United States v. McGauley*, 279 F.3d 62, 72 n.7 (1st Cir. 2002) (same). Preserved evidentiary rulings are reviewed for abuse of discretion. *United States v. Villa-Guillen*, 102 F.4th 508, 515 (1st Cir. 2024). If error is found, the government must prove it was harmless; that is, the government has the burden to demonstrate that it is "highly probable that the error did not influence the verdict." *United States v. Casas*, 356 F.3d 104, 121 (1st Cir. 2004).

**B. The judge abused his discretion in admitting dramatic and irrelevant testimony that the cooperating witness had been kidnapped and tortured by the Sinaloa drug cartel.**

It was undisputed that Figueroa played no part in the Sinaloa drug cartel's kidnapping and torture of Pedro Magana, which occurred months before the charged conspiracy involving Figueroa began.[7] Nevertheless, the Court rejected arguments that the evidence was irrelevant. PTC Tr.27–28 (R.A.27–28). The emotion contained in this testimony is evident even from a cold transcript, as Magana was unable to complete his sentences and was offered a moment to collect himself during his recitation of the torture he suffered, and his fear for his life that resulted. Tr.2:18–19 (R.A.195–96).

This testimony was irrelevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, the evidence of Magana's kidnapping,

---

[7] The event occurred after cash was seized from Magana's courier in August 2018. Tr.2:14 (R.A.191). The conspiracy alleged in the indictment began in or about February 2019. R.A.14. The government agreed there was no allegation that Figueroa was personally involved in Magana's kidnapping and torture. PTC Tr.28 (R.A.28).

prolonged beating, torture, and fear of death was not relevant to any issue before the jury. *See* Tr.2:17–19 (R.A.194–96). And even if this evidence was technically relevant, it should have been excluded under Rule 403, as the minimal probative value was substantially outweighed by a danger of unfair prejudice. *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1398 (9th Cir. 1990) (where testimony on Medellin Cartel was not directly relevant to the charged plots, it was irrelevant, and descriptions of "bribery, torture, murder" as cartel methods had "much prejudicial effect"). In *United States v. Cristerna-Gonzalez*, the Tenth Circuit held that evidence that referenced the Sinaloa cartel, but was far less detailed and emotional than that given here, was erroneously admitted. 962 F.3d 1253, 1266 (10th Cir. 2020). The probative value of the evidence was low and "it could suggest to the jury that the trained narcotics agent who was testifying believed that Defendant posed a special danger because he was part of a notorious cartel." *Id*.

### C. The error was not harmless.

The government will be unable to prove that this error was harmless. The emotional testimony provided drama and intrigue in an otherwise routine trial about cash transactions. Not only was this

irrelevant or, at best, negligibly probative testimony developed at trial, but the government then leveraged Magana's testimony about having been kidnapped and tortured in its closing argument, despite this being unrelated to Figueroa. *E.g.*, Tr.3:120 (R.A.471).

Magana testified that when he was kidnapped, he was brought to meet "Rojo," who he understood was Frank Cruz's "boss or customer". Tr.2:17–18 (R.A.194–95). He was then beaten and tortured. Tr.2:18–19 (R.A.195–96). In closing, the government argued that "Rojo" supplied drugs to drug traffickers in the United States, and that the money that Figueroa gave to the couriers in several charged transaction was ultimately wired to Rojo. Tr.3:112, 114 (R.A.463, 465). The government argued that Figueroa was one of Rojo's customers, Tr.3:119 (R.A.470), even going so far as to argue that Figueroa "knew what he had to do in order to get his money to Pedro in order to continue to get drugs from Rojo." Tr.3:124 (R.A.475).[8]

---

[8] This certainly was a stretch of the evidence, as the only testimony about Rojo was that he was "Frank's boss or customer", that Pedro believed Rojo was a drug dealer, that Rojo participated in the kidnapping and torture, and that Rojo threatened him. Tr.2:17–18, 33 (R.A.194–95, 210).

The prosecutor also reminded the jury of the irrelevant torture testimony in closing, stating:

> Pedro told you that Rojo had him kidnapped and tortured after he lost over $300,000 in drug proceeds that belonged to Rojo, $300,000 in drug proceeds that were seized by law enforcement in New York from Pedro's couriers. It took Pedro years to pay off that debt, and when he did, he fled to the United States.

> Rojo had told him, "You are only living to pay this debt." And when Pedro finally paid back that debt, he knew his life was in danger and he fled to the United States.

Tr.3:120 (R.A.471). Even in its rebuttal argument, the government asserted, "You know it's drug proceeds because the $585,000 all went back to Mexico to Rojo." Tr.3:148 (R.A.499). These statements exacerbated the risk that the irrelevant testimony affected the verdict and "increased the likelihood of prejudice because the improper remarks were among 'the last words spoken to the jury by the trial attorneys.'" *United States v. Ayala-Garcia*, 574 F.3d 5, 20 (1st Cir. 2009), quoting *United States v. Manning*, 23 F.3d 570, 575 (1st Cir. 1994). Indeed, the prosecutor invoked Rojo's name fifteen times in closing and rebuttal, and "Rojo" was the last word out of her mouth. Tr.3:110–112, 114, 119–120, 124, 146, 148 (R.A.461–63, 465, 470–71, 475, 497, 499). Magana's credibility was crucial in this trial. There was strong evidence that

Figueroa had handled large sums of cash on several occasions over a year and several months, but evidence that this money was tied to drug proceeds, as required for conviction, was equivocal. Magana was the linchpin of the government's case, as he provided the details about his customers in Mexico and their ties to drug sales. His testimony about his kidnapping and torture bolstered his credibility and the jury's sympathy for him, while simultaneously painting Figueroa as a dangerous and violent person. Other than Magana's testimony, the evidence was "suggestive, but not overwhelming." *United States v. Meises*, 645 F.3d 5, 24 (1st Cir. 2011). Outside of Magana's involvement, the evidence that pointed to possible drug involvement consisted of two recorded conversations (one of a cooperating witness placing a recorded phone call, the other by undercover officers recording themselves picking up cash from Figueroa), and the contents of Figueroa's phone, which were downloaded twice in border searches.

The recorded phone conversation was not placed to a phone number tied to Figueroa as part of the investigation, did not appear to be between two people who knew each other well, was placed by someone who was likely providing information in exchange for a benefit and allowed to

remain anonymous and did not testify at trial, and did not result in any type of drug sale or transaction. Tr.2:117, 126–136, 142, 145 (R.A.294, 303–13, 319, 322). This call was unpersuasive.

The recorded encounter with undercover officers was similarly not overwhelming evidence of drug involvement. Officer Alex Hernandez's testimony about this encounter was conclusory and improper. *See* Part II, *infra*. The officers initiated the drug talk in that encounter. Tr.3:30 (R.A.381). It did not result in any drug transactions or offers to sell. The slang used ("perico") was confusing, given its alternative meaning, "coffee," while the conversation occurred in a Colombian restaurant. Tr. 3:36, 41–42 (R.A.387, 392–93). In addition, the most inculpatory statement of Figueroa's, "I am the factory," rings hollow where police had no evidence he had manufactured, let alone sold, drugs.

Finally, the contents of Figueroa's cell phone did not provide solid, reliable evidence of connections to drugs, particularly on a large scale. His phone did not contain the tracking numbers of packages that were seized and found to contain drugs. Where the police, over the course of a four-year, multi-agency investigation had not intercepted any drugs, had not performed a controlled buy, did not observe him selling or receiving

drugs, and did not find drugs on his person or in his car, the evidence of drug involvement was weak. Tr.1:49–51, 102–09 (R.A.65–67, 118–25). Magana was indispensable to the government's case.

Further, Magana's testimony regarding the kidnapping, beating, and threats cast a shadow of violence and guilt by association over Figueroa, despite the agreement of all parties that he was not involved in the kidnapping and torture plot.

The trial judge's erroneous introductory instructions exacerbated the prejudice from this error. In his opening remarks to the jury, the judge stated,

> I have a few words about your conduct as jurors. They're pretty simple, and I think Marsha's probably gone over them with you.
>
> The first one sounds harder than it is, but actually I'm required to tell you not to discuss the case or anything about it with each other or anyone else before you begin your deliberations. That's the way the Court of Appeals -- words that I think would be absolutely impossible, given human nature, to swear you to an oath of silence. So I think what the Court of Appeals means, and what I mean by it, is that don't offer any opinion about any ultimate issue in the case until you've heard all of the evidence and then begin deliberations and have the chance to hear what your fellow jurors think. Until then, keep an open mind.

Tr.1:8–9 (R.A.31–32). This instruction flouted this Court's pronouncement in *United States v. Jadlowe*, 628 F.3d 1, 14–15 (1st Cir. 2010), that instructions permitting the jury to discuss the case before deliberations as long as they did not express an ultimate opinion about the outcome of the case was "unmistakably erroneous[.]"[9] *Id.*; see also *id.* at 18 ("while jury discussion that does not involve expressions of ultimate opinions may be found harmless in retrospect, it is a different question whether district courts may give the jury permission at the outset of the trial to talk about the case before formal deliberations begin. We now hold expressly that they may not.").

One key reason for the ban on case discussion before formal deliberations is the concern that, "since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors,[10] will be unfavorable to the defendant for this

---

[9] The trial judge in *Jadlowe* also presided over this case.

[10] Because the jury was permitted to discuss the case before the alternate juror was selected, this also violated Fed. R. Crim. P. 24(c)(3), which dictates that the "court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is

reason." *Id*. at 17. "[T]he mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint." *Id*.

The highly emotional kidnapping evidence was introduced early in the trial. The jurors had abundant opportunity to discuss it prior to jury instructions and deliberations. The judge appeared to permit it. The risk that they did so (put another way, the government's inability to prove they did not discuss it) should carry substantial weight in the prejudice inquiry. "Impressions formed about the evidence early on may nonetheless have a significant impact on the verdict, even if the jurors do not make their ultimate judgment until the end of the case." *Id*. at 18. This evidence harmed Figueroa and denied him a fair trial.

---

discharged." "'[D]iscussion is an integral part of deliberations' and [] '[i]n a constitutional sense, the distinction between discussion and deliberation is more apparent than real[.]'" *Jadlowe*, 628 F.3d at 18, quoting *State v. Washington*, 438 A.2d 1144, 1148 (Conn. 1980).

## II. The trial judge erred in allowing overview and ultimate issue testimony from law enforcement witnesses.

### A. Special Agent O'Shaughnessy offered impermissible overview testimony.

"[O]verview testimony is problematic when it 'consists of declarations by a witness – commonly a law enforcement officer involved in the investigation at issue – presented early during trial to describe the government's general theory of the case.'" *United States v. Rodriguez-Adorno*, 695 F.3d 32, 37 (1st Cir. 2012), quoting *United States v. Vázquez-Rivera*, 665 F.3d 351, 356 (1st Cir. 2011). This testimony often relies on hearsay rather than personal knowledge and previews testimony of upcoming witnesses. *Id.* at 38, quoting *Meises*, 645 F.3d at 14 & n.13. It is "especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government." *Id.*, quoting *United States v. Flores–de–Jesús,* 569 F.3d 8, 17 (1st Cir. 2009).

O'Shaughnessy's testimony suffered from all of the ills of overview testimony. He testified in a conclusory fashion about the roles of others, and alleged they were associated with Figueroa. Tr.1:53 (R.A.69) ("We identified [Joaquin Coboj-Acosta] as a supplier or DTO cell head working in conjunction with Mr. Figueroa."); *id.* (identifying Carlos Estrella as

"another drug trafficker" associated with Figueroa); Tr.1:52–53 (R.A.68–69) (identifying Jesus Emilio Campoy-Acuna as a DTO cell head, and stating he was a target of investigation based on Figueroa's cell phone extractions).[11] This was improper for several reasons, including that the use of the word "we" "expressed the combined opinion of [this officer] and other unidentified officers, based on the totality of similarly-unidentified information gathered over the course of the investigation[.]"*Vázquez-Rivera*, 665 F.3d at 358.

He previewed the government's case by testifying about events with which he was not involved, only some of which were the subject of later witnesses' testimony. *E.g.*, Tr.1:56–57 (R.A.72–73) (testimony that agent was able to confirm that Magana and Figueroa had contact); Tr.1:75 (R.A.91) (testimony about a vehicle stop performed by a State Trooper that agent was not present for), Tr.1:98–99 (R.A.114–15) (testimony about a vehicle stop agent was not present for). He testified to hearsay he learned from others, some of whom would testify and some who did not. Tr.1:51 (R.A.67) (testimony that his "counterparts with" Homeland

___

[11] O'Shaughnessy used "DTO" as an abbreviation for "drug trafficking organization." *See*, e.g., Tr.1:39.

Security contacted Customs and Border Patrol to detain Figueroa and search his phone in March 2018 and February 2020); Tr.1:68–69 (R.A.84–85) (agent heard from Francisco Torres – an individual arrested for drug crimes who did not testify at trial – that Figueroa's nickname or alias was "Maiky"); Tr.1:74–75 (R.A.90–91) (received information from Magana that there would be a money drop involving Figueroa on a particular day); Tr.1:85–86 (R.A.101–02) (Magana provided a phone number to San Diego agents, who then passed it along); Tr.1:89 (R.A.105) (describing information received from DEA Agent Rob Vega); Tr.1:90 (R.A.106) (received information from DEA Financial Investigations Team); Tr.1:91–92 (R.A.107–08) (describing that other "FIT Team" agents ran a particular phone number for their investigation); Tr.1:98 (R.A.114) (other agents coordinated a vehicle stop). See *Vázquez-Rivera*, 665 F.3d at 358 (testimony improper when based on overall investigation instead of officer's personal observations).

## B. Officer Hernandez's inadmissible, conclusory testimony.

Officer Alex Hernandez should not have been permitted to testify that the cash he picked up from Figueroa was "drug proceeds." Tr.3:21, 28, 52, 54 (R.A.372, 379, 403, 405); *see also* Tr.3:43, 45, 49 (R.A.394, 396,

400). This testimony did not assist the jury, and instead usurped their role.

Hernandez's testimony constituted lay opinion testimony that went to the ultimate issue for the jury to decide: whether the funds he was picking up from Figueroa were drug proceeds. *See* Fed. R. Evid. 701(b) (lay witness opinion testimony must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue"); *Vázquez-Rivera*, 665 F.3d at 358 ("lay opinions going to the ultimate issue will rarely meet [the Rule 701(b)] requirement, 'since the jury's opinion is as good as the witness's") (quoting *United States v. Sanabria*, 645 F.3d 505, 518 (1st Cir. 2011). In *United States v. Rodriguez-Adorno*, the parties agreed on appeal that the agent's description of the event at issue as a "carjacking" was erroneous. 695 F.3d 32, 39 (1st Cir. 2012). The testimony was based on hearsay, and it was inadmissible lay opinion testimony pertaining to the ultimate issue. *Id*. The same is true here. Hernandez had no direct evidence regarding the source of the funds, and characterizing them as "drug proceeds" was unhelpful and impermissible.

## C. Forensic auditor Lauren George's testimony suffered from the same issues.

Forensic auditor Lauren George, of the United States Attorney's Office, testified that "Cobo Acosta" was "Indio" and was "part of the organization." Tr.3:80–81 (R.A.431–32). Defense counsel objected to this conclusory testimony. *Id.* This statement was hearsay, and conclusory. Cf. *Vázquez-Rivera*, 665 F.3d at 358. She also testified that the bank activity in this matter was "money laundering transactions." Tr.3:58 (R.A.409).

## D. The inadmissible law enforcement testimony prejudiced Figueroa.

Defense counsel objected to three of the above-listed instances of Special Agent O'Shaughnessy's testimony,[12] and did not object to the remaining instances. He objected to one of Officer Hernandez's references to "drug proceeds", Tr.3:28 (R.A.379), and objected to George's testimony about Coboj-Acosta, but not her conclusory testimony about "money laundering transactions." Tr.3:58, 80–81 (R.A.409, 431–32). "[W]hen there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be

---

[12] Tr.1:53–54, 1:74–75 (R.A.69–70, 90–91).

considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required." *United States v. Pereira*, 848 F.3d 17, 30 (1st Cir. 2017), quoting *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). If those errors are cumulatively harmless, "the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error." *Caraway*, 535 F.3d at 1302.

"The inquiry to determine whether cumulative errors are harmless is the same as for individual error." *Meises*, 645 F.3d at 23. "'[I]ndividual errors, *insufficient in themselves to necessitate a new trial*, may *in the aggregate* have a more debilitating effect' and thus add up to prejudice." *United States v. Baptiste*, 8 F.4th 30, 39 (1st Cir. 2021), quoting *United States v. Sepúlveda*, 15 F.3d 1161, 1195–96 (1st Cir. 1993) (emphasis in original).

> The rubric of cumulative error demands that trial errors be weighed "against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case."

*Sanabria*, 645 F.3d at 516–17, quoting *Sepúlveda,* 15 F.3d at 1196.

The government will not be able to establish that "it is highly probable that the [combined preserved errors] did not influence the verdict." *Casas*, 356 F.3d at 121. The main issue for the jury to decide was whether the cash that Figueroa had was drug proceeds. Officer Hernandez's conclusory testimony on this exact issue left the jury no room to form their own conclusions as to guilt or innocence. The same is true for O'Shaughnessy's and George's testimony that Coboj-Acosta was identified "as a supplier or [Drug Trafficking Organization] cell head working in conjunction with Mr. Figueroa." Tr.1:53 (R.A.69); *see also* Tr.3:80–81 (R.A.431–32) (George's similar testimony about Coboj-Acosta). (It was not established how the police knew Coboj-Acosta was a DTO cell head, and the only other testimony about him at trial was that he had been in contact with Figueroa and sent him a photo of a bag of pills.) *See* Tr.1:74, Tr.3:80–81, 87 (R.A.90, 431–32, 438). O'Shaughnessy was the first witness the jury heard from, setting the tone for the trial, and George was the last to testify.

The jury was not given any curative instructions. Instead, as described above, *supra* at 25–27, the judge's instruction allowed the jurors to discuss the case prior to deliberations, giving further influence

to O'Shaughnessy's testimony. Also as described above, the government's case regarding the source of the funds was not strong. *Supra* at 23–25.

Alternatively, if this Court finds that the government can show the above-listed preserved errors did not influence the verdict, the preserved errors, combined with those that are unpreserved, meet the plain error test. To establish plain error, Figueroa must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Canty*, 37 F.4th 775, 790 (1st Cir. 2022), quoting *United States v. Solís-Vásquez*, 10 F.4th 59, 64 (1st Cir. 2021); *United States v. Rosario-Pérez*, 957 F.3d 277, 289 (1st Cir. 2020) (reversing for plain error from improper trial evidence).

The law on overview and conclusory testimony is well-established, and the violations listed above were clear, as described above. "The third prong of plain error review, that an error affects a defendant's substantial rights, generally requires the defendant to 'show a reasonable probability that, but for the error, the outcome of the proceeding would have been

different." *Canty*, 37 F.4th at 790, quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 134–35 (2018).

The errors above cumulatively allowed for an unfair presentation of the government's case, and the testimony of an experienced investigator that the money Figueroa was handling was drug proceeds and that agents were able to identify several drug trafficking organization heads as Figueroa's associates affected his substantial rights. *Cf. Meises*, 645 F.3d at 24. The Court did not intervene to keep out hearsay, conclusory, or overview testimony. Without the conclusory hearsay testimony from the government's witnesses, and including the error described in Argument I, the government's case as to the money constituting drug proceeds was relatively weak, as described above. It is reasonably probable that the jurors would have concluded differently without the impermissible testimony offered throughout (and the judge's erroneous instruction allowing them to discuss this testimony prior to deliberations).

If the first three plain error prongs have been met, the appellate court "should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of

judicial proceedings." *Rosales-Mireles*, 585 U.S. at 135. Because improprieties infected the testimony of the government's very first witness, who outlined the government's entire case, and was repeated in the testimony of other witnesses, the trial was infected with unfairness. This Court also should send a message to the District Court that its "unmistakably erroneous" jury instruction should not be repeated. *See Jadlowe*, 628 F.3d at 15. Reversal is required.

## Conclusion

For the foregoing reasons, standing individually and in combination, this Court should vacate Mr. Figueroa's conviction and remand the case to the District Court for a new trial.

Dated: March 17, 2025        Respectfully submitted,
MARK ANTHONY FIGUEROA
By his Attorney,

/s/ David J. Nathanson
David J. Nathanson
1st Cir. Bar No. 81606
JELLISON & NATHANSON, LLP
55 Union Street, 4th Fl.
Boston, MA 02108
Tel. (617) 248-1806
dnathanson@JNdefense.com

With him:
Danya F. Fullerton
B.B.O. # 683134

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


UNITED STATES,
Appellee

v.

MARK ANTHONY FIGUEROA,
Defendant – Appellant


Certificate of Compliance


1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,073 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


/s/ David J. Nathanson
DAVID J. NATHANSON
Attorney for the Defendant-Appellant

## CERTIFICATE OF SERVICE

I, DAVID J. NATHANSON, certify that true copies of the Brief and Record Appendix for the Appellant, Mark Anthony Figueroa, will be served through the ECF system on or before March 17, 2025, to:

Leah Belaire Foley
Theodore Babcock Heinrich
Donald Campbell Lockhart
Evan D. Panich
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210

Date: March 17, 2025         /s/ David J. Nathanson
                             DAVID J. NATHANSON

# ADDENDUM

Excerpts from Final Pretrial Conference,
  Mar. 23, 2023 ................................................................................Add.2

Judgment in a Criminal Case ...........................................................Add.5

Fed. R. Crim. P. 24 ..........................................................................Add.13

Fed. R. Evid. 401 .............................................................................Add.15

Fed. R. Evid. 701(b) ........................................................................Add.15

```
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3      * * * * * * * * * * * * *
        UNITED STATES OF AMERICA    *
 4                                   *    CRIMINAL ACTION
                      v.             *    No. 21-10333-RGS-1
 5                                   *
        MARK ANTHONY FIGUEROA        *
 6                                   *
        * * * * * * * * * * * * *
 7

 8           BEFORE THE HONORABLE RICHARD G. STEARNS
                  UNITED STATES DISTRICT JUDGE
 9                  FINAL PRETRIAL CONFERENCE
                       March 23, 2023
10

11      APPEARANCES:

12           UNITED STATES ATTORNEY'S OFFICE, (By AUSA Leah B.
        Foley and AUSA Evan D. Panich) 1 Courthouse Way, Suite
13      9200,  Boston, Massachusetts, 02210, on behalf of the
        United States of America
14
             RUDOLPH F. MILLER LAW, (By Rudolph F. Miller, Esq.)
15      875 Massachusetts Avenue,, Cambridge, Massachusetts
        02139, on behalf of the Defendant
16
             LAW OFFICES OF JAMES E. McCALL, (By James E.
17      McCall, Esq.), 107 Union Wharf, Boston, Massachusetts
        02109, on behalf of the Defendant
18

19

20                                   Courtroom No. 21
                                     1 Courthouse Way
21                                   Boston, Massachusetts 02210

22
                        James P. Gibbons, RPR, RMR
23                        Official Court Reporter
                       1 Courthouse Way, Suite 7205
24                      Boston, Massachusetts  02210
                         jamesgibbonsrpr@gmail.com
25
```

1    counsel, and I haven't heard any objection.  I don't believe

2    there is any, but did want to raise that for your honor.

3        The last thing, our second witness is likely to be one

4    of the cooperating witnesses.  He is going to testify

5    regarding his experience working with Mexican drug cartels,

6    and this will be relevant to establishing that the money

7    that was laundered was, in fact, proceeds of drug

8    traffickings, as we've alleged in the indictment.

9        That testimony will include his experience about his --

10   there will be testimony about his experience being kidnapped

11   by the drug cartel.

12       We did want to raise that for the Court, just given the

13   sort of cinematic nature of that testimony, in advance so

14   you're not caught off guard.  We informed defense counsel,

15   and obviously if there is an objection there will be an

16   objection, but didn't want to blindside you with that.

17           THE COURT:  No.  I think a witness can tell his or

18   her own story as long as it's relevant to what we are doing.

19       It sounds like it might be a kind of Breaking Bad

20   interest in the testimony as it unfolds.

21           MR. McCALL:  I think there will be an objection,

22   though, Judge, to being kidnapped and things like that.  I

23   think that type of testimony has no relevance to this case.

24           THE COURT:  Well, what I would do is give a

25   curative instruction at that point to the jury saying there

1    is no allegation that the defendant was involved in any plot

2    to kidnap this witness or anybody else.

3              MR. PANICH:  And that's certainly -- we think

4    that's certainly appropriate.  There is no allegation that

5    the defendant was personally involved in that.

6              THE COURT:  I can deal with that.

7              MR. McCALL:  And we'd also ask the government's

8    assistance.  We may refer to the PowerPoint in our opening,

9    so technologically speaking...

10             THE COURT:  Yeah, that's fine.

11        I do a fair amount of lecturing for the Department of

12   Defense and their rule is that you have to have a

13   PowerPoint.  So I usually make up slides, and they have

14   nothing to do with what I'm saying, but...

15        (Laughter.)

16             MR. McCALL:  We're going to piggyback, your Honor.

17             THE COURT:  But just make sure you know how to use

18   the technology because it gets a little...

19             MR. McCALL:  That's why I bring it up.  I have no

20   idea how to use it, and I'm going to refer to my brother.

21             THE COURT:  Okay.  I'm sure they'll help you out

22   with the PowerPoint.

23        Okay.  I look forward to seeing you on Monday.

24             MR. PANICH:  Thank you, your Honor.

25             MR. McCALL:  Thank you, your Honor.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| | ) | |
| Mark Anthony Figueroa | ) | Case Number:  1:21CR10333-1 |
| | ) | USM Number:  66497-004 |
| | ) | |
| | ) | Rudolph F. Miller & James E. McCall |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)     1
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1956(h) & | Money Laundering Conspiracy | 5/31/2020 | 1 |
| 18 U.S.C. § 1956(a)(1) | | | |

    The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

 

                                                  3/20/2024

Date of Imposition of Judgment

                                      /s/ Richard G. Stearns

Signature of Judge

                                    Honorable Richard G. Stearns

Name and Title of Judge

                                      3/22/2024

Date

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:   Mark Anthony Figueroa
CASE NUMBER:   1:21CR10333-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

120 months

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Add. 6

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 2A — Imprisonment

Judgment—Page   3   of   8

DEFENDANT:   Mark Anthony Figueroa
CASE NUMBER:  1:21CR10333-1

## ADDITIONAL IMPRISONMENT TERMS

The Court makes a judicial recommendation that the defendant participate in substance abuse treatment while in Bureau of Prisons' custody.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___8___

DEFENDANT:   Mark Anthony Figueroa
CASE NUMBER:   1:21CR10333-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add. 8

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | |
|---|---|---|
| | Judgment—Page | 5 of 8 |

DEFENDANT:  Mark Anthony Figueroa
CASE NUMBER:  1:21CR10333-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

Add. 9

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page   6   of   8

DEFENDANT:   Mark Anthony Figueroa
CASE NUMBER:   1:21CR10333-1

## SPECIAL CONDITIONS OF SUPERVISION

1. You must submit to substance use testing, not to exceed 104 drug tests per year, to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

2. You must use your true name and are prohibited from the use of any false identifying information which includes, but is not limited to, any aliases, false dates of birth, false social security numbers, and incorrect places of birth.

3. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

4. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

5. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

Add. 10

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __7__ of __8__

DEFENDANT:  Mark Anthony Figueroa
CASE NUMBER: 1:21CR10333-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ 30,000.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ 0.00 | $ 0.00 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  Mark Anthony Figueroa
CASE NUMBER:  1:21CR10333-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ ___100.00___ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☑  Payment during the term of supervised release will commence within ___30___ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names             Joint and Several       Corresponding Payee,
*(including defendant number)*       Total Amount       Amount              if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Add. 12

**Rule 24. Trial Jurors**

**(a) Examination.**
**(1) In General.** The court may examine prospective jurors or may permit the attorneys for the parties to do so.
**(2) Court Examination.** If the court examines the jurors, it must permit the attorneys for the parties to:
**(A)** ask further questions that the court considers proper; or
**(B)** submit further questions that the court may ask if it considers them proper.

**(b) Peremptory Challenges.** Each side is entitled to the number of peremptory challenges to prospective jurors specified below. The court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly.
**(1) Capital Case.** Each side has 20 peremptory challenges when the government seeks the death penalty.
**(2) Other Felony Case.** The government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges when the defendant is charged with a crime punishable by imprisonment of more than one year.
**(3) Misdemeanor Case.** Each side has 3 peremptory challenges when the defendant is charged with a crime punishable by fine, imprisonment of one year or less, or both.

**(c) Alternate Jurors.**
**(1) In General.** The court may impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties.
**(2) Procedure.**
**(A)** Alternate jurors must have the same qualifications and be selected and sworn in the same manner as any other juror.
**(B)** Alternate jurors replace jurors in the same sequence in which the alternates were selected. An alternate juror who replaces a juror has the same authority as the other jurors.
**(3) Retaining Alternate Jurors.** The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a

retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

**(4) Peremptory Challenges.** Each side is entitled to the number of additional peremptory challenges to prospective alternate jurors specified below. These additional challenges may be used only to remove alternate jurors.

**(A) One or Two Alternates.** One additional peremptory challenge is permitted when one or two alternates are impaneled.

**(B) Three or Four Alternates.** Two additional peremptory challenges are permitted when three or four alternates are impaneled.

**(C) Five or Six Alternates.** Three additional peremptory challenges are permitted when five or six alternates are impaneled.

## Rule 401. Test for Relevant Evidence

Evidence is relevant if:
**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and
**(b)** the fact is of consequence in determining the action.

## Rule 701. Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
**(a)** rationally based on the witness's perception;
**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.