No. 24-1311

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

———————

UNITED STATES OF AMERICA,
APPELLEE

v.

MARK ANTHONY FIGUEROA,
DEFENDANT-APPELLANT

———————

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————

BRIEF FOR THE UNITED STATES

———————

LEAH B. FOLEY
UNITED STATES ATTORNEY

DONALD C. LOCKHART
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3193

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................1

    A.    Procedural history...................................................................1

    B.    Offense facts..........................................................................2

        1.    The structure of the money laundering operation.......................2

        2.    The six money laundering transactions involving defendant, the July 2019 recorded call in which he discussed importing drugs across the Mexico-Arizona border, his recorded boast that he was a drug dealing "factory," and his incriminating statements upon arrest.............6

            (a)    February 2019: $72,000 laundered to Mexico ................6

            (b)    March 2019: $82,300 laundered to Mexico ....................7

            (c)    April 2019: seizure of $100,050 headed to Mexico ........8

            (d)    July 2019 recorded call: "I have the whole line" ............9

            (e)    October 2019: $107,865 laundered to Mexico...............10

            (f)    April 2020: seizure of $101,000 headed to Mexico .......11

            (g)    May 2020: seizure of $109,100 headed to Mexico ........13

            (h)    December 2021 arrest of defendant.................................13

        3.    Other evidence of guilt: phone contents and dirty drivers........14

SUMMARY OF ARGUMENT ................................................................15

ARGUMENT ........................................................................................16

I.    The district court did not plainly err in failing *sua sponte* to preclude
      Magana from testifying about being kidnapped and beaten at the
      direction of the Mexican cartel boss whose drug distributions were
      central to the money laundering conspiracy .................................................16

      A.    Standard of review................................................................................16

      B.    The testimony was highly relevant and not unfairly prejudicial.........18

II.   Any error in the admission of alleged "overview" and "ultimate
      opinion" testimony was harmless under any standard ..................................23

      A.    Agent O'Shaughnessy's testimony .....................................................23

      B.    Officer Hernandez's testimony ...........................................................30

      C.    Forensic auditor George's testimony ..................................................31

      D.    Alleged cumulative error......................................................................32

CONCLUSION....................................................................................33

CERTIFICATE OF COMPLIANCE.......................................................34

CERTIFICATE OF SERVICE ...............................................................35

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*United States v. Agramonte-Quezada,*
  30 F.4th 1 (1st Cir. 2022) ......................................................27

*United States v. Almeida,*
  748 F.3d 41 (1st Cir. 2014) ...................................................18

*United States v. Armenteros-Chervoni,*
  133 F.4th 8 (1st Cir. 2025) ....................................................21

*United States v. Ayala-Vazquez,*
  751 F.3d 1 (1st Cir. 2014) .......................................................1

*United States v. Benjamin-Hernandez,*
  49 F.4th 580 (1st Cir. 2022) .................................................29

*United States v. Brown,*
  669 F.3d 10 (1st Cir. 2012) ...................................................27

*United States v. Burnett,*
  579 F.3d 129 (1st Cir. 2009) ...........................................20-21

*United States v. Caparotta,*
  676 F.3d 213 (1st Cir. 2012) .................................................32

*United States v. Casanova,*
  886 F.3d 55 (1st Cir. 2018) ...................................................20

*United States v. Casas,*
  425 F.3d 23 (1st Cir. 2005) ...................................................29

*United States v. Correia,*
  55 F.4th 12 (1st Cir. 2022) ....................................................21

*United States v. Encarnacion,*
  26 F.4th 490 (1st Cir. 2022) .................................................18

*United States v. Etienne,*
  772 F.3d 907 (1st Cir. 2014) .................................................26

*United States v. Flores-De-Jesus,*
    569 F.3d 8 (1st Cir. 2009) ...................................................26

*United States v. Flores-Rivera,*
    787 F.3d 1 (1st Cir. 2015) ....................................................20

*United States v. Garcia-Morales,*
    382 F.3d 12 (1st Cir. 2004) .................................................29

*United States v. García-Sierra,*
    994 F.3d 17 (1st Cir. 2021) ........................................... 25, 29

*United States v. Grullon,*
    996 F.3d 21 (1st Cir. 2021) .................................................18

*United States v. Jadlowe,*
    628 F.3d 1 (1st Cir. 2010) .............................................. 22-23

*United States v. Martinez-Medina,*
    279 F.3d 105 (1st Cir. 2002) ...............................................21

*United States v. Meises,*
    645 F.3d 5 (1st Cir. 2011) ...................................................26

*United States v. Meléndez-González,*
    892 F.3d 9 (1st Cir. 2018) ...................................................29

*United States v. Pabon,*
    819 F.3d 26 (1st Cir. 2016) .................................................18

*United States v. Pereira,*
    848 F.3d 17 (1st Cir. 2017) .................................................32

*United States v. Pontz,*
    132 F.4th 10 (1st Cir. 2025) ...............................................31

*United States v. Pérez-Vásquez,*
    6 F.4th 180 (1st Cir. 2021) ............................................ 25-26

*United States v. Rathbun,*
    98 F.4th 40 (1st Cir. 2024) ........................................ 18, 21-22

iv

*United States v. Reardon*,
111 F.4th 142 (1st Cir. 2024) ................................................................32

*United States v. Rodriguez*,
525 F.3d 85 (1st Cir. 2008) ...................................................................29

*United States v. Rodriguez-Adorno*,
695 F.3d 32 (1st Cir. 2012) ............................................................. 26, 30

*United States v. Sanchez*,
354 F.3d 70 (1st Cir. 2004) ...................................................................32

*United States v. Tkhilaishvili*,
926 F.3d 1 (1st Cir. 2019) .....................................................................20

*United States v. Valdivia*,
680 F.3d 33 (1st Cir. 2012) ...................................................................25

*United States v. Velázquez-Aponte*,
940 F.3d 785 (1st Cir. 2019) ........................................................... 21, 25

*United States v. Williams*,
630 F.3d 44 (1st Cir. 2010) ...................................................................32

## <u>FEDERAL RULES OF EVIDENCE</u>

Fed. R. Evid. 403 ............................................................................. 20-21

# STATEMENT OF THE ISSUES

1.     The district court did not plainly err in failing *sua sponte* to preclude a witness from testifying about being kidnapped and beaten at the direction of the Mexican cartel boss whose drug distributions were central to the money laundering conspiracy.

2.     Any error in the admission of alleged "overview" and "ultimate opinion" testimony was harmless under any standard.

# STATEMENT OF THE CASE

## A.     Procedural history

A grand jury indicted Mark Anthony Figueroa (defendant) and a second man for conspiring to launder proceeds of drug dealing from roughly February 2019 to May 2020. [RA: 14-17].[1] The charge alleged a two-fold intent: to "promote" drug distributions and to "conceal" the nature of the funds. [RA: 14-15]. *See United States v. Ayala-Vazquez*, 751 F.3d 1, 14 (1st Cir. 2014) (explaining statutory distinction).

At trial, the government introduced evidence showing defendant laundered or attempted to launder over half a million dollars in drug proceeds in order to pay back the Mexican cartel boss from whom he had received the drugs. [*Infra* 2-14]. The trial

---

[1] The record appendix is cited as "RA:__", the supplemental appendix as "SA:__", the government's addendum as "GA:__", trial exhibits as "Ex.__", and docket entries as "ECF__".

featured a series of episodes in which defendant supplied large sums of cash ($72,000 to $109,000) to money couriers working for a cooperating witness who in turn was collecting the funds for the boss in Mexico. [*Infra* 2-14]. Defense counsel argued the government failed to prove defendant was a drug dealer or that the cash was derived from dealing. [RA: 43-45, 478-496]. The jury disagreed and convicted him after brief deliberations. [RA: 10, 525, 528].

The district court (Stearns, J.) sentenced defendant to ten years in prison. [RA: 12]. He timely appeals. [RA: 12]. The procedural history of the two evidentiary issues raised on appeal is discussed below.

### B.     Offense facts

### 1.     The structure of the money laundering operation

<u>Rojo</u> was a drug trafficker based in Culiacan, a city in the state of Sinaloa, Mexico known as a haven for drug dealers. [RA: 169, 194-195]. Rojo shipped drugs across the border into the United States, where they were distributed by people like defendant who then had to repay Rojo from the proceeds of the drug sales. [RA: 191-210, 220-221; SA: 42-50; *infra* 2-14].

<u>Frank Cruz</u> worked with Rojo in Culiacan. [RA: 195]. Cruz was responsible for collecting money owed by the United States dealers who had acquired drugs from Rojo—funds that were funneled back to Mexico by an elaborate process described below. [RA: 168-169, 179-180, 195, 215-218; *infra* 2-14].

Pedro Magana-Aladro was a key player in the Cruz/Rojo money laundering network who cooperated and testified at trial. Magana explained how he employed a team of United States-based "couriers" to collect drug proceeds from dealers indebted to the organization, after which he would wire the money to Cruz-controlled bank accounts in Culiacan. The system worked as follows: Cruz or his partner Oscar Leal would tell Magana the phone number of the drug dealer or "customer" who was ready to make a "money drop" to pay his debt, generally a day or two ahead of the drop; Magana would then contact the customer and one of his couriers and arrange for the two to meet at a particular address for the drop, typically in Boston, New York, Philadelphia, Los Angeles, or Phoenix; just before the drop, the courier would tell Magana the unique serial number on a dollar bill and Magana would share this number with the customer so the customer and courier could prove their *bona fides* when they met, and Magana would also tell the customer other details such as the clothing the courier would be wearing; at the drop, the courier would take the cash from the customer, deposit it in a Bank of America (BOA) account, and wire the money to a Magana-controlled bank account in Mexico; and Magana would then wire the money from that account to bank accounts in Culiacan controlled by Cruz and his associates. [RA: 173-190, 198-201, 216, 231-234; *infra* 4-14].

3

In one instance, Cruz instructed Magana to wire the drop money to a lawyer for the Sinaloa Cartel drug lord "El Chapo." [RA: 190, 218]. On cross-examination, defense counsel elicited the fact that Magana understood he was laundering money for a Mexican drug cartel based in Sinaloa although he could not be sure which specific faction Cruz and his associates worked for. [RA: 217, 227].

Magana knew Cruz from when Magana ran a currency exchange business in Mexicali, Mexico, where he had laundered drug proceeds for Cruz, converting dollars that had been ferried over the border into pesos and wiring the money to Cruz's bank accounts in Culiacan. [RA: 167-173, 194-195]. Magana agreed to assist in this endeavor at a meeting in Culiacan attended by Cruz and a Rojo associate named Javier. [RA: 169-173, 193-195]. The later decision to shift to a United States-based courier system that avoided the risky cross-border transfer of dollars was made at a meeting in Culiacan attended by Magana and Cruz. [RA: 173-175, 179-182].

In August 2018, about six months before the first money drop associated with defendant, law enforcement seized over $300,000 from a New York hotel room, thereby foiling a Rojo-related money drop that Magana had coordinated with one of his couriers. [RA: 191-194]. Without objection, Magana testified Cruz was angry with him as a result and that a Cruz associate named Fernando who was a brother-in-law of Javier detained him for a day or two in a "security house" in Culiacan that was equipped with prison bars. [RA: 191-194]. Also without objection, Magana

testified that, after this, Fernando and another man blindfolded him and took him to a ranch-style house for a meeting with Rojo, where he was handcuffed and beaten and told he was expected to continue working for the organization to repay the seized money [RA: 194-196], a subject the defense explored on cross-examination [RA: 220-221]. Again without objection, Magana described how Rojo threatened him during the meeting: "[H]e literally told me, like, 'You're going to be living to pay me.'" [RA: 210]. It was due in part to this experience that Magana began cooperating with law enforcement while continuing to work for Cruz and Rojo. [RA: 196-198].

Agents handling Magana told him that if he ever felt threatened he should go to the border. [RA: 209-210]. After the money drops involving defendant [*infra* 6-13] were done and Magana had nearly paid his debt to Rojo, he sensed he was in danger and went to the border, where agents arranged for his admission to the United States. [RA: 209-211, 224]. Back in Mexico, Cruz and his associates confiscated Magana's home, cars, business, and personal belongings. [RA: 211-212]. There was no objection to this testimony either.

Defendant Mark Anthony Figueroa was a Boston-based drug dealer who sold drugs supplied at least in part by Rojo and who paid Rojo back by providing drug proceeds to couriers associated with Magana. [SA: 42-50, 274-285; RA: 295-313, 423-442, 454-456; GA: 4; *infra* 2-14]. Defendant also owned a restaurant in Jamaica Plain called JPizle Boston. [RA: 64-65]. His nickname was "Maiky"/"Mikey." [RA:

5

63, 230, 298, 331; SA: 16, 43, 48]. In the charged period, defendant laundered or attempted to launder over half a million dollars in drug proceeds. [*Infra* 6-13].

The drug trafficking and money laundering system employed by Rojo, Cruz, Magana, and defendant was typical for operations importing drugs from Mexico into the United States. [RA: 50-62].

> **2.     The six money laundering transactions involving defendant, the July 2019 recorded call in which he discussed importing drugs across the Mexico-Arizona border, his recorded boast that he was a drug dealing "factory," and his incriminating statements upon arrest**

> **(a)     February 2019: $72,000 laundered to Mexico**

Between 9:33 a.m. and 10:43 a.m. on February 27, 2019, defendant and Magana texted and phoned each other about an upcoming money drop. [SA: 4; RA: 72-73, 83-84, 199-200].

At 10:44 a.m., defendant drove in his Range Rover from his home in Jamaica Plain to the Yotel Hotel in Boston, where he carried a brown duffel bag into the hotel and met with a Magana courier named Alfredo Vidal-Ibarra, who was waiting for him. [Exs. 2, 4 (videos); RA: 73-77, 183, 198-201]. After going to a third-floor room [Ex. 4 (video)], defendant gave Vidal-Ibarra $80,010 in cash. [RA: 74-82]. Vidal-Ibarra then walked to a nearby BOA branch and deposited the money into an account in his name. [Ex. 30 (video); SA: 105, 111; RA: 76-77, 81-82, 410-411; GA: 1]. The next day, $72,000 was wired from that account to a bank account in Mexico

controlled by Magana, and Magana then forwarded the money by wire to Cruz in Culiacan. [SA: 106; RA: 174, 190, 411; GA: 1].

### (b)     March 2019: $82,300 laundered to Mexico

In the morning of March 15, 2019, defendant left his home and flew to Orlando, Florida. [Ex. 5 (video); RA: 85-88]. After he arrived, Magana texted him on how to meet with a Magana courier named Christian Fernandez for a money drop near the airport, describing Fernandez's physical appearance, the clothes he was wearing, the car he was driving, and the drop place. [SA: 16-18; RA: 183, 201-204, 230]. At the appointed spot, officers watched as defendant and Fernandez spoke in a truck, with one of them holding up a cellphone. [Exs. 19.1, 19.2 (videos); RA: 239-250; SA: 38-41 (photos)]. Inside the truck, the two confirmed the dollar serial number for the deal and defendant gave Fernandez $85,000 which he placed in a backpack. [RA: 271-273]. They then drove to a nearby BOA branch and Fernandez went inside the bank and deposited $85,000 in cash into an account he had created for Magana. [SA: 112-113, 117; RA: 246-250, 274, 412; GA: 1]. Two days later, $82,300 was wired from that account to a bank account in Mexico controlled by Magana, and Magana then forwarded the money by wire to Cruz in Culiacan. [SA: 117; RA: 174, 190, 412; GA: 1].

Fernandez confirmed the details of this money drop and Magana's testimony about how the money laundering system worked in general. [RA: 256-277]. In

addition, he testified without objection about a threatening phone call he received from someone he believed was a drug cartel member, in which the caller stated that certain money in Fernandez's bank account belonged to him. [RA: 276-277].

### (c)    April 2019: seizure of $100,050 headed to Mexico

At 8:26 p.m. on April 17, 2019, defendant exchanged text messages with his partner Joaquin Coboj-Acosta, also known as "Indio," who asked defendant "how much [money] you are going to deliver," to which defendant responded "100," meaning $100,000. [SA: 270-272; RA: 68-69, 89-90, 416-417]. On April 18, Magana informed officers there would be a money drop later that day. [RA: 91].

Between 8:42 a.m. and 1:30 p.m. on April 18, defendant and Magana phoned each other many times. [SA: 5-6; RA: 89-90, 94].

Around 1:30 p.m. that day, defendant left his house carrying a large bag and a backpack, got in his Range Rover, and drove toward his restaurant at 536 Centre Street in Jamaica Plain. [Ex. 6 (video); RA: 88-93]. A trooper stopped defendant en route and discovered the backpack held a shoebox containing $100,050 in cash. [RA: 91, 333-340; SA: 51 (photo)]. Defendant said the money was from his restaurant and that it generated $100,000 in sales every month. [RA: 337-339]. Cash receipts and bank records, however, reflected that the restaurant's revenue was a small fraction of that amount. [RA: 415-416, 419-423; GA: 3].

### (d)    July 2019 recorded call: "I have the whole line"

In July 2019, an informant who had dealt with defendant had a recorded phone call with him that was initiated and monitored by law enforcement. [Ex. 22.1 (audio); SA: 42-50; RA: 295-313]. The informant twice referred to defendant by his nickname "Mikey" and identified himself as Roberto from Tucson, "Luis's buddy," an apparent reference to a relative of defendant's. [SA: 43, 48; RA: 303]. Defendant confirmed he was Mikey. [SA: 43]. Officer Alex Hernandez, who spoke with defendant at length while in an undercover role [*infra* 11-12], testified he recognized defendant's voice in the recording. [RA: 383]. Hernandez and defendant are both Puerto Rican and defendant spoke with a Puerto Rican accent. [RA: 380-381].

During the six-minute phone conversation, defendant said he would be in the Tuscon area in August, both north and south of the border. [SA: 44; RA: 304-305]. The two then discussed the fact that the informant was prepared to supply defendant with "little cheeses," "equipment," and "white things" (references to cocaine) at a price of "Thirty-five" ($35,000) per "kilo," which was at the high end of the market rate. [SA: 44-46; RA: 305-309]. Defendant remarked "It's very expensive!" and then explained that "I buy them there in, in Micho [Michoacan] . . . I buy them at fourteen there, I take them up to 'N', Nogales, at eighteen," that "[i]f I pass them already to Nogales, America [*i.e.*, Nogales, Arizona, which is directly across the border from Nogales, Mexico], I put them there at twenty-one, around that," and that "here [*i.e.*,

the Boston area] they sell it from twenty-eight to thirty." [SA: 46-47; RA: 309-312].

Defendant added, "I already have everything, I have the whole line, do you understand?" [SA: 47; RA: 312], which an agent interpreted to mean that defendant had a settled distribution line running from the source in Mexico "all the way up to the distribution in America" [RA: 312-313]. Even so, defendant said, he and his "partner" would need something in "about two weeks from now," and they would call him tomorrow and eventually "come to see [him]" in person. [SA: 48].

### (e) October 2019: $107,865 laundered to Mexico

Between about 8:00 p.m. on September 30, 2019 and 1:00 p.m. on October 1, 2019, Magana and defendant texted and phoned each other with details for a money drop defendant was to make at his restaurant with a Magana courier named Ricardo Valenzuela-Gale, including the dollar bill serial number to be used. [SA: 7, 20-37; RA: 94-95, 101-102, 183, 204-208, 229-230, 383]. Meanwhile, in a series of texts, Magana coordinated with Valenzuela-Gale on this and other drops that were taking place in the surrounding days, confirming dollar serial numbers, the amounts to be deposited, and the clothes Valenzuela-Gale and his fellow couriers were wearing. [SA: 140-269; RA: 208-209].

At 1:15 p.m. on October 1, defendant left his house carrying a black backpack with a red pouch and walked to his restaurant, arriving about 1:20 p.m. and going inside. [Exs. 8, 11 (videos); SA: 203-205; RA: 95-97, 100]. Valenzuela-Gale arrived

about a minute later carrying a gray backpack, sat on a bench outside the restaurant, and appeared to start texting on his phone. [Ex. 11 (video); RA: 97, 99, 102-103]. About two minutes after that, defendant emerged from the restaurant talking on his phone (phone records reflect a 1:24 p.m. call with Magana at this juncture), and joined Valenzuela-Gale on the bench. [Ex. 11 (video); SA: 7; RA: 98, 104]. Valenzuela-Gale handed defendant a dollar bill and defendant scrutinized it while looking at his phone. [Ex. 11 (video); RA: 98, 104]. The two then disappeared inside the restaurant for about six minutes. [Ex. 11 (video); RA: 98-99, 104-105].

When they reemerged, defendant was now carrying the gray backpack and Valenzuela-Gale was now carrying the black backpack with the red pouch, and they walked from 536 Centre Street toward nearby BOA branches. [Ex. 11 (video); SA: 8-12 (photos); RA: 99-100, 105-106, 209]. Valenzuela-Gale deposited $75,000 at a BOA branch at 677 Centre Street and $33,700 at a BOA branch at 315 Centre Street. [SA: 128, 138, 206-208; RA: 413; GA: 1]. The next day, $74,200 and $33,665 respectively were wired from these BOA accounts to a bank account in Mexico controlled by Magana, and Magana then forwarded the money by wire to Cruz in Culiacan. [SA: 128, 138; RA: 174, 190, 413; GA: 1].

### (f)     April 2020: seizure of $101,000 headed to Mexico

Pretending to be a money courier who could pick up drug proceeds, Officer Alex Hernandez "passed [his] phone number to [a confidential informant], who

passed it to the money broker, which was then passed along to the DTO [drug trafficking organization] and then ultimately filtered to Mr. Figueroa," and "then shortly after [Hernandez] got a phone call from Mr. Figueroa." [RA: 370-373, 386, 394, 400, 402]. In ensuing phone calls and texts, defendant and Hernandez arranged a money drop at the address for JPizle on April 16, 2020. [SA: 52-66, 85-86; RA: 371-374]. Defendant said he might have as much as $150,000 for pickup and used the prearranged code "On behalf of Nelson." [SA: 53-54; RA: 371-372].

At about 11:46 a.m. on April 16, defendant walked from his house to his restaurant (which was closed due to the pandemic) carrying a black backpack and went inside. [Exs. 12, 13 (videos); RA: 108-109, 111-112]. Officer Hernandez and a second undercover officer arrived about 12:07 p.m. and went in the restaurant after defendant refused to conduct the transaction outside. [Ex. 13 (video); RA: 109-110, 373-378]. Once inside, defendant counted out $101,000 in bundles and told the officers where they could deposit the money in nearby banks. [Ex. 28 (video); SA: 87-95; RA: 378-380]. As the deal concluded, Officer Hernandez remarked that it was "hard to find the merchandise [*i.e.*, drugs] now" and asked if defendant dealt in "perico" (slang for cocaine), to which defendant replied that he was a "factory" and dealt in "everything." [Ex. 28 (video); SA: 93; RA: 381-382, 392, 403-405]. A few minutes later, the agents emerged from the restaurant carrying a white plastic bag with the $101,000 in cash. [Ex. 13 (video); SA: 96-102 (photos); RA: 110].

**(g)     May 2020: seizure of $109,100 headed to Mexico**

At about 2:12 p.m. on May 1, 2020, defendant bicycled from his house to his restaurant (still closed due to the pandemic) with a black backpack, arriving at about 2:30 p.m. and entering the building. [Ex. 39 (video); RA: 112-113, 360-362]. Just after this, Leslie Nunez arrived and went inside the restaurant. [Ex. 40 (video); RA: 113, 363]. She emerged 40 minutes later carrying a white plastic bag and got in an Uber, placing the bag in the trunk. [Ex. 41 (video); RA: 113-114, 364]. A trooper pulled the Uber over and recovered the bag, which contained $109,100. [SA: 273 (photo); RA: 114-115, 146-155, 364-365]. When the trooper showed Nunez the bag, she denied it belonged to her. [RA: 153]. Nunez was then in possession of a Mexican passport and driver's license as well as Arizona driver's permits. [RA: 154]. In the days leading up to and following the seizure of the $109,100, two of Nunez's bank accounts showed a pattern of large cash deposits followed quickly thereafter by corresponding wire withdrawals. [RA: 414-415; GA: 2].

**(h)     December 2021 arrest of defendant**

On December 11, 2021, agents arrested defendant at Logan Airport and read him his *Miranda* warnings. [RA: 115-117; Ex. 1 (video)]. Defendant "flatly denied" he had been involved in any of the cash deliveries, even the one to the undercover officers. [RA: 116-117; Ex. 1 (video)]. He also claimed he had a "Bitcoin mining" business and that two documented trips he had taken to Mexico were for that

13

purpose. [RA: 127-128; Ex. 1 (video)]. He did not contend, however, that the $584,960 in the six deals discussed above related to Bitcoin transactions, consistent with his outright denial that he had anything to do with that money. [RA: 143-144; Ex. 1 (video)].

### 3. Other evidence of guilt: phone contents and dirty drivers

Images of FedEx tracking numbers and related data in defendant's phone, and corresponding FedEx records, tied him to: (a) shipments of boxes (weighing about 6-8 pounds each) from Nogales and Tucson, Arizona to the Boston area and vice versa; (b) two corrupt FedEx drivers who were in regular contact with defendant and who were intercepting boxes containing cocaine, fentanyl, and heroin addressed to people who were not the true intended recipients (*e.g.*, Harvard University staff) and diverting them to the dealers; and (c) two particular FedEx shipments originating in Tucson and that were also linked to defendant's partner Coboj-Acosta, a/k/a "Indio." [RA: 423-437, 441-442, 454-456; SA: 274-275; GA: 4].

In a WhatsApp chat found on defendant's phone, defendant and Coboj-Acosta discussed how much profit they would make from selling a bag of what appeared in a photo to be counterfeit oxycodone or Percocet pills of the sort that typically contain fentanyl. [SA: 276-285; RA: 437-441].

# SUMMARY OF ARGUMENT

1.     The district court did not err—let alone plainly err—in admitting Magana's testimony about being kidnapped and beaten at the direction of the Mexican cartel boss whose drug distributions were central to the money laundering conspiracy. The episode constituted further proof that the large sums of cash defendant later processed through Magana's money couriers were drug proceeds that were being funneled to the boss as payment for prior drug shipments; it set the stage for defendant's ensuing money drops; and it helped explain why Magana cooperated with law enforcement. The evidence was not unfairly prejudicial since the testimony was brief and there was no suggestion defendant had anything to do with the encounter or had engaged in similar conduct himself.

2.     Defendant's thirteen "overview" testimony claims are largely, if not entirely, unpreserved. The government concedes three parts of this testimony should not have been admitted. The other parts were not plain error. And any error here was harmless under any standard given the overwhelming proof—documented on videotape and in defendant's own recorded words—that defendant was laundering drug money. Defendant's remaining evidentiary issues are by turns unpreserved, perfunctory, and insubstantial, and none could have altered the verdict even if viewed cumulatively with the overview issues.

## ARGUMENT

**I.     The district court did not plainly err in failing *sua sponte* to preclude Magana from testifying about being kidnapped and beaten at the direction of the Mexican cartel boss whose drug distributions were central to the money laundering conspiracy**

### A.     Standard of review

At a pretrial conference held several days before trial, the government noted it had told defense counsel that Magana would testify concerning his experience working with a Mexican drug cartel and the kidnapping, which were "relevant to establishing that the money that was laundered was, in fact, proceeds of drug traffickings, as we've alleged in the indictment," while adding that it was unclear whether there would be an objection to that testimony. [RA: 27]. The district court expressed a tentative and qualified view that Magana could "tell his . . . own story *as long as it's relevant* to what we are doing" and that "[i]t *sounds* like it *might* be a kind of Breaking Bad interest in the testimony as it unfolds." [RA: 27 (emphasis added)]. Counsel replied that "I *think* there will be an objection, though, Judge, to being kidnapped and things like that," and "I *think* that type of testimony has no relevance to this case." [RA: 27 (emphasis added)]. The court then suggested it might address any prejudice concerns with a limiting instruction to the effect that there was no allegation defendant was involved in the kidnapping, and the government agreed

this could be a possible solution. [RA: 27-28]. Counsel did not disagree, and instead shifted to a different topic. [RA: 28].

Defense counsel did not broach the subject of Magana's upcoming testimony in the ensuing days or on the first trial day. On the second trial day, Magana testified concerning his loss of the $300,000 in seized drug proceeds belonging to Rojo, his being blindfolded and taken to a meeting with Rojo at which Rojo told him he would only live to repay that money, and his being beaten, as outlined above [*supra* 4-5]. [RA: 191-196]. Counsel offered no objections to this testimony [RA: 191-196], apparently since he hoped to profit from it by suggesting on cross-examination that Magana was trying to curry favor with the jury by portraying himself as "the victim" in recounting the episode [RA: 220-221], a theme counsel later exploited in closing: "And speaking of scurrilous and scoundrel behavior, the government would have you believe that Pedro Magana is some sort of victim because the Sinaloa cartel kidnapped him and dragged him off somewhere and put a hood on him and beat him." [RA: 483]. Counsel also refrained from requesting the limiting instruction the district court had offered at the pretrial conference.

Defendant now argues his trial counsel did not need to object to preserve his claims for appeal because the district court issued a "definitive" pretrial ruling that Magana's testimony was admissible. [Br. 18]. As the quoted record makes clear, however, the court's remarks on the subject were qualified and conditional and far

from final, as counsel himself appreciated by stating "I *think* there will be an objection" [RA: 27 (emphasis added)], thus signaling not only that he was mulling what his position would be but that he knew the court's thinking was provisional and that he would need to object at trial. *See, e.g.*, *United States v. Encarnacion*, 26 F.4th 490, 504 (1st Cir. 2022); *United States v. Grullon*, 996 F.3d 21, 30-31 (1st Cir. 2021); *United States v. Almeida*, 748 F.3d 41, 50 (1st Cir. 2014). Hence, review is at best for plain error. *Id*.

Because defendant makes no effort to address the plain-error standard or to explain how he can satisfy its four prongs, his lead appellate claims are waived. *See United States v. Rathbun*, 98 F.4th 40, 58 (1st Cir. 2024) (citing *United States v. Pabon*, 819 F.3d 26, 33 (1st Cir. 2016)). Regardless, defendant fares no better even if he is afforded plain-error review.

### B.    The testimony was highly relevant and not unfairly prejudicial

Defendant personally engaged in six videotaped money drops involving over half a million dollars in cash. [*Supra* 6-13]. Because he could not distance himself from the drops, the key issue was whether the money he handed to Magana's couriers was the proceeds of drug dealing, as charged in the indictment, or was pure as the driven snow, as the defense jury arguments suggested. [RA: 43-45, 478-496].

The government proved the drug dealing nexus through several categories of evidence, including: defendant's incriminating statements in the July 2019 recorded

call discussing his drug supply line running from Mexico across the Arizona border and up to Boston; his April 2020 recorded boast that he was a drug dealing "factory"; the images found on his phone linking him to the Arizona packages and to the corrupt FedEx drivers who were diverting boxes of cocaine, fentanyl, and heroin; and the secretive and elaborate process the parties used to move huge sums of cash that had no evident legitimate source. [*Supra* 2-14].

Further proof that the money at issue was from drug dealing was the fact that, six months before the first documented money drop involving defendant, the man at the apex of the drops, Magana, had a face-to-face meeting with Rojo, the Mexican cartel boss to whom the laundered funds were being transmitted—with assistance from Cruz—in order to repay Rojo for the drugs he had supplied. The fact that the meeting with Rojo was held to punish Magana for losing $300,000 in seized drug proceeds and to ensure Magana would continue to serve the organization until this loss was repaid only heightens its relevance. The clear inference was that the money defendant later supplied to Magana's couriers was intended to pay back Rojo for drugs Rojo had supplied to defendant and that the money was proceeds from the sale of those drugs. The money also served, in part, to pay down the debt Magana owed to Rojo due to the earlier seizure. In addition to confirming the funds being laundered were the proceeds of drug sales, Magana's meeting with Rojo set the stage for the

later money drops involving defendant and helped explain why Magana cooperated with law enforcement. The evidence was thus highly probative.

On the other side of the ledger, the evidence was not unfairly prejudicial. The entire episode occupied five transcript pages, as part of which Magana stated—in two sentences that did not go into graphic detail—that he was struck by a "paddleboard thing." [RA: 192-196]. There was no suggestion defendant was involved in any facet of the encounter or that he had engaged in similar conduct himself, which could explain why defense counsel never sought the limiting instruction the district court said it was prepared to give. The mere fact that the jury may have felt some sympathy for Magana did not make the evidence excludable.

Although Rule 403 balancing cases are by their nature factually idiosyncratic, several illustrate why the evidence here was not *unfairly* prejudicial. *See, e.g., United States v. Tkhilaishvili*, 926 F.3d 1, 16 (1st Cir. 2019) (evidence of prior violent acts was not unfairly prejudicial even though it concerned defendant's own conduct); *United States v. Casanova*, 886 F.3d 55, 63 (1st Cir. 2018) (evidence of co-defendant's violent acts was not unfairly prejudicial in part because no trial witness testified defendant himself engaged in such conduct); *United States v. Flores-Rivera*, 787 F.3d 1, 27-28 (1st Cir. 2015) (co-conspirator's threat to murder rival drug dealer was "relevant to proving the conspiracy's existence" and the risk of unfair prejudice was low because defendant was not involved in the incident); *United States v.*

*Burnett*, 579 F.3d 129, 134-35 (1st Cir. 2009) (defendant's own death threats to a witness's child were not unfairly prejudicial since there were no "graphic details"); *United States v. Martinez-Medina*, 279 F.3d 105, 116 (1st Cir. 2002) (evidence of two murders was relevant to proving drug conspiracy and not unfairly prejudicial).

At the very least, it is far from plain or obvious that the probative value of the evidence was "substantially outweighed" by the danger of "unfair prejudice" for purposes of Rule 403, *see generally United States v. Armenteros-Chervoni*, 133 F.4th 8, 27-29 (1st Cir. 2025), such that the district court had a duty *sua sponte* to preclude Magana from testifying on the topic even in the absence of objections. Moreover, given the overwhelming proof of defendant's guilt, recorded in his own words, on his cellphone, and on videotape, he cannot satisfy his "heavy burden" under the third plain-error prong of showing a "reasonable probability," *United States v. Velázquez-Aponte*, 940 F.3d 785, 793, 800 (1st Cir. 2019), that the admission of the contested testimony affected the verdict.

Defendant argues the government's jury arguments concerning this testimony were improper [Br. 21-22], but he did not object below [RA: 461-463, 465, 470-471, 475, 497, 499], so review is for plain error, *United States v. Correia*, 55 F.4th 12, 46 (1st Cir. 2022), and his failure to tackle that test yields waiver, *Rathbun*, 98 F.4th at 58. Waiver aside, there was no error, much less obvious error, because the quoted arguments [Br. 21-22] properly mined this highly relevant evidence and reasonable

inferences from it consistent with the points made above. [*Supra* 18-20]. Contrary to defendant's suggestions, the government never used the evidence to "paint[] [him] as a dangerous and violent person" [Br. 23] or to "cast a shadow of violence and guilt by association over [him]" [Br. 25].

Nor is the analysis altered by the fact that the district court allowed the jurors to discuss the case before deliberations so long as they did not "offer any opinion about any ultimate issue in the case until [they had] heard all of the evidence and [begun] deliberations" [RA: 32], contrary to *United States v. Jadlowe*, 628 F.3d 1, 14-22 (1st Cir. 2010), which criticized a similar instruction by the same judge. There was no objection, and defendant does not try to pass the plain-error test [Br. 25-27], thus waiving the point. *See Rathbun*, 98 F.4th at 58. In any event, he cannot satisfy his burden under prong three of showing a reasonable probability that the instruction affected the verdict for the same reasons this Court found the instruction in *Jadlowe* was harmless even though (unlike here) it was the subject of a preserved trial objection and the Court assumed the government bore the burden of establishing harmlessness beyond a reasonable doubt: (1) "the record is silent on whether the jurors engaged in premature discussions of the case," and it is possible any such conversations concerned only "tangential matters"; (2) the Court must "presume that the jurors did not express opinions about [defendant's] guilt or innocence"; and (3) the case was "not close" but rather was based on "overwhelming proof of guilt."

*Jadlowe*, 628 F.3d at 21-22. Further, defendant's theory as to why he was prejudiced by the instruction appears to hinge on the premise that the kidnapping/beating testimony was inadmissible, and that is not so for the reasons discussed.

## II. Any error in the admission of alleged "overview" and "ultimate opinion" testimony was harmless under any standard

### A. Agent O'Shaughnessy's testimony

Before trial, defendant moved to exclude "overview" testimony. [RA: 18-19]. The government responded that it intended to elicit testimony about the background of the investigation but that it would be based primarily on personal knowledge in line with this Court's decisions. [RA: 21-23]. The district court accordingly granted the defense motion "consistent with the government's understanding of the permitted scope of agent testimony." [RA: 9, 25; ECF 82].

Defendant now faults [Br. 28-30] thirteen portions of Special Agent Michael O'Shaughnessy's testimony as impermissible overview testimony, often with little elaboration: (1) based on data extracted from defendant's phone, "[w]e identified [Coboj-Acosta] as a supplier or DTO [drug trafficking organization] cell head working in conjunction with Mr. Figueroa" [RA: 68-69]; (2) based on data extracted from defendant's phone, "we identified [Jesus Emilio Campoy-Acuna] as another DTO cell head" [RA: 68-69]; (3) based on data extracted from defendant's phone, Carlos Estrella "is another drug trafficker . . . [a]ssociated with Mr. Figueroa" [RA:

68-69]; (4) defendant and Magana phoned and texted each other prior to the February 27, 2019 money drop [RA: 72-73]; (5) in connection with the April 18, 2019 money drop, a trooper stopped defendant as he was driving and seized $100,000 [RA: 89-91]; (6) in connection with the May 1, 2020 money drop, agents "coordinated a vehicle stop with the Massachusetts State Police" and a trooper pulled over the Uber Nunez was traveling in and seized a large amount of cash [RA: 113-115]; (7) other agents conducted border searches of defendant's phone and extracted data from it on March 14, 2018 and February 27, 2020 [RA: 67]; (8) agents "initially heard" that defendant's nickname was "Maiky" from Francisco Torres "following his arrest" [RA: 84-85]; (9) on April 18, 2019, Magana informed officers there would be a money drop later that day [RA: 90-91]; (10) Magana told other agents that 857-218-2282 was defendant's phone number [RA: 101-102]; (11) in connection with the October 1, 2019 money drop, a surveilling agent reported that defendant and Valenzuela-Gale were about to leave the restaurant [RA: 105]; (12) prior to the April 16, 2020 money drop, agents predicted it would occur based on "information from our FIT Team" [RA: 106]; and (13) the phone number defendant used to set up the April 16, 2020 money drop with undercover officer Hernandez "was run by the FIT Team members that day" [RA: 107].

Defense counsel objected only to the first and ninth portions of this testimony. [RA: 69, 90-91]. Although defendant implies counsel objected to the third, to the

24

effect that based on data extracted from his phone Carlos Estrella "is another drug trafficker . . . [a]ssociated with Mr. Figueroa" [RA: 68-69], that is not so. Counsel only objected to a follow-on question asking "who was [Estrella's] supplier?" [RA: 70], and the government dropped the matter after the district court responded to the objection by stating: "Jurors, as I reminded you, there is no guilt by association. You will have to wait for evidence before you draw this conclusion that the agent is suggesting you make." [RA: 70]. Moreover, even in the case of the two objections, neither cited "the 'overview' grounds now presented on appeal." *United States v. Valdivia*, 680 F.3d 33, 47 n.10 (1st Cir. 2012) (reviewing for plain error on that basis); *see also United States v. García-Sierra*, 994 F.3d 17, 26 (1st Cir. 2021) (relying on footnote 10 in *Valdivia* in concluding review was for plain error because defendant did not "object[] at trial" on the ground that disputed statements made by the agent "constituted inadmissible 'overview' testimony").

As a result, review is for plain error only. *See United States v. Pérez-Vásquez*, 6 F.4th 180, 199 (1st Cir. 2021). Defendant must establish that these thirteen portions of testimony constitute obvious error, and he bears the "heavy burden" under the third plain-error prong of showing a "reasonable probability," *Velázquez-Aponte*, 940 F.3d at 793, 800, that their admission altered the verdict. Assuming the two generic objections preserved "overview" challenges to those two portions notwithstanding *Valdivia* and *García-Sierra*, review as to these is for an abuse of

discretion, and any error is harmless if it is "highly probable" they did not affect the verdict. *See United States v. Rodriguez-Adorno*, 695 F.3d 32, 38 (1st Cir. 2012).

The government concedes the first three parts of Agent O'Shaughnessy's testimony identifying the roles of three men in a DTO involving defendant should not have been admitted. It also acknowledges that, thereafter, no trial evidence was offered concerning two of those men: Campoy-Acuna and Estrella.[2] Under the circumstances, this was plain error. *See Pérez-Vásquez*, 6 F.4th at 199; *United States v. Meises*, 645 F.3d 5, 13-16 (1st Cir. 2011); *United States v. Flores-De-Jesus*, 569 F.3d 8, 17 (1st Cir. 2009).

The remaining parts of Agent O'Shaughnessy's testimony present closer calls. First, it is not obvious from the existing record that O'Shaughnessy had no first-hand knowledge about, or personal involvement in, all of these subjects. *See United States v. Etienne*, 772 F.3d 907, 916 (1st Cir. 2014) ("To the extent that there is any ambiguity about [the officer's] knowledge of prior acts [that were the subject of alleged overview testimony], we will not, on plain error review, permit Etienne to gain any benefit from his choice not to clarify the ambiguity."). That O'Shaughnessy may have been on the periphery of some events (*e.g.*, a trooper's car stop several

_____

[2] The record indicates O'Shaughnessy's testimony concerning the roles of the three men was based at least in part on data extracted from defendant's phone [RA: 68-69], but the segments of that dataset that were admitted at trial focused on Coboj-Acosta and did not refer to the other two men [SA: 270-272, 274-285].

blocks away) rather than the main actor in the event does not matter. *See United States v. Brown*, 669 F.3d 10, 25 (1st Cir. 2012) (testimony concerning "events [that an agent] observed and orchestrated during [his] oversight" of the case was not improper). Second, these parts did not involve the sort of overview testimony "that effectively opines that a defendant is guilty based on the totality of information gathered in the agent's investigation" and that "simply dress[es] up argument as evidence." *United States v. Agramonte-Quezada*, 30 F.4th 1, 19 (1st Cir. 2022) (cleaned up). And third, with the possible exception of the seventh and thirteenth parts, the government introduced trial evidence to substantiate the key facts in question. [*Supra* 2-14].[3] At a minimum, there was no obvious error.

Even assuming some or all of the remaining portions were plainly inadmissible such that the district court had a duty *sua sponte* to exclude them, there is no likelihood these errors and the three conceded errors altered the verdict, regardless of which harmless error standard is employed, given the overwhelming

---

[3] As to the seventh, that the data in defendant's phone was extracted at border searches that occurred on particular dates was not particularly significant since the limited data from the phone that was admitted at trial came in without objection [SA: 2-3; RA: 176, 431, 437-440, 443], and there was no dispute about its origin. As to the thirteenth, there was no dispute that defendant had used his phone to set up the April 16, 2020 money drop with undercover officer Hernandez, and it is unclear how the fact that his phone number was "run" by other officers that day added anything to the equation.

evidence that the half million-plus dollars in cash defendant laundered as part of the six videotaped money drops was the proceeds of drug dealing.

Multiple categories of evidence prove the point. To reiterate, in the July 2019 recorded call, defendant described his supply line running from Mexico across the Arizona border and up to Boston, using unguarded language that made manifest he was speaking about an established drug distribution network. [*Supra* 9-10]. Second, in his April 2020 recorded conversation with the undercover officers to whom he had tendered $101,000 in cash, defendant responded to Officer Hernandez's query whether he dealt in "perico" (cocaine) by bragging that he was a "factory" and dealt in "everything." [*Supra* 11-12]. Third, the clear inference from Magana's meeting with Rojo was that the money defendant later supplied to Magana's couriers was intended to pay back Rojo for drugs Rojo had supplied to defendant and that the money came from the sale of those drugs. [*Supra* 4-5, 18-20]. Fourth, images found on defendant's phone linked him to the Arizona packages and to the corrupt FedEx drivers who were diverting boxes of cocaine, fentanyl, and heroin. [*Supra* 14]. That FedEx records for two seized boxes containing drugs were not found in defendant's phone hardly diminishes the potency of this proof. Fifth, defendant's flat denials that he was involved in any of the money drops and his implausible story about "Bitcoin mining" were damning indicators of consciousness of guilt. [*Supra* 13-14]. And sixth, the secretive and complex process that defendant, the couriers, Magana, and

Cruz used to move huge sums of cash that had no evident legitimate source—employing surreptitious money drops, code words, and dollar bill serial numbers—erased any possible doubt about the origin of the money. [*Supra* 2-13]. The idea that it was restaurant receipts or Bitcoin-related funds was fanciful.

An additional factor is pertinent. Although it is true that overview testimony "remains problematic even when the specific information undergirding the officer's conclusory statements eventually comes into evidence," *García-Sierra*, 994 F.3d at 26, this circumstance weighs in favor of a harmless error finding, *id*. at 28 (error was harmless in part because "[t]he factual matter provided by [the officer's overview] testimony otherwise came into evidence"). *Accord United States v. Meléndez-González*, 892 F.3d 9, 18-19 (1st Cir. 2018). And here, the lion's share of the alleged overview testimony concerned matters that were the subject of later trial evidence and/or were indisputable.

Accordingly, the conceded errors and any further errors were harmless, and thus the Court may avoid an extended analysis of the substance of the overview claims. *See, e.g.*, *United States v. Benjamin-Hernandez*, 49 F.4th 580, 589 (1st Cir. 2022); *García-Sierra*, 994 F.3d at 27-28; *United States v. Rodriguez*, 525 F.3d 85, 96-97 (1st Cir. 2008); *United States v. Casas*, 425 F.3d 23, 50-52 (1st Cir. 2005); *United States v. Garcia-Morales*, 382 F.3d 12, 16-18 (1st Cir. 2004).

## B.    Officer Hernandez's testimony

Defendant argues [Br. 30-31] that Officer Hernandez gave inadmissible lay opinion testimony on an ultimate issue when he referred to the $101,000 in cash defendant supplied during the April 2020 undercover transaction [*supra* 11-12] as "drug proceeds." [RA: 372, 379, 394, 396, 400, 403, 405]. Three of these instances occurred on cross-examination. [RA: 394, 396, 400]. As defendant acknowledges [Br. 32], only one instance elicited an objection, and defense counsel did not state the ground for it. [RA: 379].

Whether reviewed for plain or preserved error, any error in the admission of this testimony was clearly harmless given the overwhelming proof that the large sums of cash involved in all six money drops, including the undercover money drop, were the proceeds of drug dealing. [*Supra* 28-29]. If more were needed, the jurors would have understood in context that Officer Hernandez's brief characterizations of the cash as "drug proceeds" on direct examination [RA: 372, 379] were keyed to the trial evidence and nothing more. Indeed, Officer Hernandez himself made this clear when pressed on cross-examination, pointing to "the codes we're using and the statements [defendant] made, that I'm there to pick up drug proceeds" [RA: 394; *see also* RA: 396, 400] and alluding on redirect to defendant's admission that he was a drug dealing "factory" when Hernandez asked if he dealt in "perico" (cocaine) [RA: 403]. *Cf. United States v. Rodriguez-Adorno*, 695 F.3d 32, 39 (1st Cir. 2012) (agent's

objected-to description of charged incident as a "carjacking" was inadmissible lay opinion testimony on an ultimate issue, but it was highly probable the error did not affect the verdict "in the context of all of the evidence offered at trial"). Thus, the Court need not definitely address the merits of defendant's claim. *See United States v. Pontz*, 132 F.4th 10, 22 (1st Cir. 2025) (bypassing the merits of evidentiary issue since any error was harmless).

### C.    Forensic auditor George's testimony

In a three-sentence argument [Br. 32], defendant says forensic auditor Lauren George gave testimony that was "hearsay" and "conclusory" when, on being shown an exhibit featuring a photo from defendant's phone that was in turn a screenshot of Coboj-Acosta's phone identifying Coboj-Acosta as "Indio" [SA: 274], she stated over objection that "Indio" was Coboj-Acosta and that Coboj-Acosta was "[a]n individual who's part of the organization." [RA: 431-432]. In a single sentence, defendant notes [Br. 32] that George answered "Yes" without objection when asked whether she had "track[ed] the flow of money with respect to the money laundering transactions at issue in this case" and whether she had "create[d] a summary chart that shows the flow of money for the money laundering transactions at issue in this case," just before that chart [GA: 4] was published to the jury without objection. [RA: 409]. Defendant does not develop any argument as to this testimony.

Defendant's perfunctory treatment of these issues should result in waiver. *See, e.g., United States v. Reardon*, 111 F.4th 142, 150 (1st Cir. 2024); *United States v. Caparotta*, 676 F.3d 213, 218 (1st Cir. 2012); *United States v. Williams*, 630 F.3d 44, 50 (1st Cir. 2010); *United States v. Sanchez*, 354 F.3d 70, 80 n.4 (1st Cir. 2004).

Regardless, there was no plain error or abuse of discretion and any error was plainly harmless under any standard. As context for her analysis and chart, George, the last witness to testify, merely referenced admitted and undeniable trial evidence showing that Coboj-Acosta was part of the organization [*supra* 8, 10, 14] and that he went by "Indio," as his phone and his texts themselves established [SA: 270-272, 274, 276-284; RA: 438-441]. And when George agreed that her analysis and chart concerned "the money laundering transactions at issue in this case" [RA: 409], the jury would have understood that the point was simply that her testimony would concern the six money drops. There was neither error nor resulting prejudice.

### D. Alleged cumulative error

Even considering all of the alleged plain and preserved errors cumulatively under this Court's approach for mixed standards of harmless error review, *see United States v. Pereira*, 848 F.3d 17, 30 (1st Cir. 2017), as defendant requests [Br. 32-33], the result is the same. For the reasons advanced above, there is no basis to think that collectively they affected the outcome of the trial.

## CONCLUSION

For these reasons, the government respectfully requests that the Court affirm

the judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ *Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limit,
### Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,945 words (an opening or answering brief may not exceed 13,000 words, a reply brief may not exceed 6,500 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

 */s/ Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney

Dated:  April 18, 2025

## CERTIFICATE OF SERVICE

I, Donald C. Lockhart, Assistant U.S. Attorney, hereby certify that on April 18, 2025, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system:

David J. Nathanson, Esq.
Jellison & Nathanson, LLP
55 Union Street, 4th Floor
Boston, MA 02108


  /s/ *Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney

No. 24-1311

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA,
APPELLEE

v.

MARK ANTHONY FIGUEROA,
DEFENDANT-APPELLANT

_____

## <u>Addendum Table of Contents</u>

1.  Summary Chart 1 (published to jury at RA: 409) ...................................GA: 1

2.  Summary Chart 2 (published to jury at RA: 414) ...................................GA: 2

3.  Summary Chart 3 (published to jury at RA: 419) ...................................GA: 3

4.  Summary Chart 4 (published to jury at RA: 433) ...................................GA: 4

**CASH DEPOSITS AND TRANSFERS = $374,710**

| | Date | Account # | Account Holder | Transaction | Trans Details | Trans Amount | Bank / Branch Details |
|---|---|---|---|---|---|---|---|
| (1) | 2/27/19 11:35 AM | BoA *5941 | Ibarra Vidal Autos | Cash deposit | conducted by Alfredo Ibarra Vidal | $80,010 | 7 Fan Pier Blvd, Boston, MA |
| | 2/28/2019 | BoA *5941 | Ibarra Vidal Autos | Cash withdrawal | | ($8,000) | California |
| | 2/28/2019 | BoA *5941 | Ibarra Vidal Autos | Wire transfer | Alfonso Cital Sandez | ($72,000) | Cibanco, S.A. Inst De Banca Multiple (Mexico) |
| (2) | 3/16/19 12:32 PM | BoA *5912 | Fernandez Trucking | Cash deposit | conducted by Christian Fernandez | $85,000 | 10419 Narcoossee Rd, Orlando, FL |
| | 3/18/2019 | BoA *5912 | Fernandez Trucking | Wire transfer | Alfonso Cital | ($82,300) | Banco Del Bajio, S.A. (Mexico) |
| (3) | 10/1/19 2:06 PM | BoA *1796 | Covarrubias Tooling | Cash deposit | conducted by Ricardo Valenzuela Gale | $75,000 | 677 Centre St, Boston, MA |
| | 10/2/2019 | BoA *1796 | Covarrubias Tooling | Wire transfer | German Ibarra Vidal | ($74,200) | Banco Regional SA Institucion (Mexico) |
| | 10/1/19 2:56 PM | BoA *3524 | Garcias Furniture | Cash deposit | conducted by Ricardo Valenzuela Gale | $33,700 | 315 Centre St, Jamaica Plain, MA |
| | 10/2/2019 | BoA *3524 | Garcias Furniture | Wire transfer | Pedro Antonio Magana Aladro | ($33,665) | Banco Regional SA Institucion (Mexico) |
| (4) | 4/16/2020 | DEA UC acct | | Cash deposit | DEA | $101,000 | |
| | 4/20/2020 | DEA UC acct | | Wire transfer | DEA UC commission account | ($4,040) | |
| | 4/20/2020 | DEA UC acct | | Wire transfer | DEA UC transfers (2) | ($96,960) | |

**CASH SEIZURES = $209,150**

| | Date | Account # | Account Holder | Transaction | Trans Details | Trans Amount | Bank / Branch Details |
|---|---|---|---|---|---|---|---|
| (6) | 4/18/2019 | | | Cash seizure | seized from Mark Anthony Figueroa | $100,050 | |
| (7) | 5/1/2020 | | | Cash seizure | seized from Leslie Jara Nunez | $109,100 | |

| | TOTAL CASH | $583,860 |
|---|---|---|

GA: 1

| SourceAcct | TransDate | TransType | Payor/Payee | Amount | Notes |
|---|---|---|---|---|---|
| JPMC-611835130 | 04/21/20 | Deposit | cash (conducted by Leslie Jara Nunez) | $109,570.00 | 60 E 42nd St, New York, NY |
| JPMC-611835130 | 04/21/20 | Deposit | cash | $100.00 | Grand Central Place, 60 E 42nd St, New York, NY |
| JPMC-611835130 | 04/22/20 | Outgoing Wire Transfer | Innovations Brands LLC | ($109,600.00) | Citicorp FL acct# 3290398299 |
| JPMC-611835130 | 04/23/20 | Deposit | cash (conducted by Leslie Jara Nunez) | $140,000.00 | 3775 Riverdale Ave, Bronx, NY |
| JPMC-611835130 | 04/24/20 | Deposit | cash (conducted by Leslie Jara Nunez) | $100,000.00 | 1475 Ruben Torres Sr Blvd, Brownsville, TX |
| JPMC-611835130 | 04/27/20 | Outgoing Intl Wire Transfer | Global Voice and Messaging Limited | ($29,515.79) | HSBC |
| JPMC-611835130 | 04/27/20 | Outgoing Intl Wire Transfer | Olympic Star Limited | ($44,445.16) | HSBC |
| JPMC-611835130 | 04/27/20 | Outgoing Intl Wire Transfer | Forever Trust Digital Co | ($57,971.00) | Yuanta Commercial Bank Co Ltd (Taiwan) |
| JPMC-611835130 | 04/28/20 | Deposit | cash (conducted by Leslie Jara Nunez) | $204,500.00 | 3724 N May Ave, Oklahoma City, OK |
| JPMC-611835130 | 04/28/20 | Outgoing Intl Wire Transfer | Shine Peaks Technology Ltd | ($53,800.00) | Taipei Fubon Commercial Bank Co Ltd (Taiwan) |
| JPMC-611835130 | 04/28/20 | Outgoing Intl Wire Transfer | Softde But Co Ltd | ($54,000.00) | Siam Commercial Bank Public Co Ltd (Thailand) |
| JPMC-611835130 | 04/29/20 | Outgoing Intl Wire Transfer | Ixgo.Net Limited | ($34,726.37) | Bank of China Hong Kong Ltd (Hong Kong) |
| JPMC-611835130 | 04/29/20 | Outgoing Intl Wire Transfer | Mayfield Motor Sports Ltd | ($168,888.00) | Handelsbankenm PLC (UK) |
| JPMC-611835130 | 04/30/20 | Wire Reversal | Mayfield Motor Sports Ltd | $168,888.00 | Not able to identify the source of funds |
| JPMC-611835130 | 05/01/20 | Outgoing Intl Wire Transfer | Shine Peaks Technology Ltd | ($36,912.00) | Taiwan; wire sent from North End branch, 48 Salem St, Boston, MA |
| JPMC-611835130 | 05/01/20 | Outgoing Intl Wire Transfer | Northern Tianjin International Business Service Co Ltd | ($130,618.00) | China; wire sent from North End branch, 48 Salem St, Boston, MA |
| JPMC-611835130 | 05/07/20 | Cash deposit | cash (conducted by Leslie Jara Nunez) | $318,600.00 | 6701 Highway 6 S, Houston, TX |
| WF-5170046022 | 04/15/20 | Deposit | cash | $100.00 | |
| WF-5170046022 | 04/16/20 | edeposit | cash (conducted by Leslie Jara Nunez) | $18,520.00 | 4/16/20 11:21am 14001 Memorial Dr, Houston, TX |
| WF-5170046022 | 04/17/20 | edeposit | cash (conducted by Leslie Jara Nunez) | $271,800.00 | 4/17/20 1:24pm 8119 Preston Rd, Dallas, TX |
| WF-5170046022 | 04/17/20 | Wire fee | | ($30.00) | |
| WF-5170046022 | 04/17/20 | Outgoing Wire Transfer | Innovation Brands LLC | ($18,500.00) | Citibank NA acct# 3290398299 |
| WF-5170046022 | 04/20/20 | Debit Card Purchase | FedEx office | ($1.40) | Dallas, TX |
| WF-5170046022 | 04/20/20 | Debit Card Purchase | FedEx office | ($5.21) | Dallas, TX |
| WF-5170046022 | 04/21/20 | Withdrawal | Innovation Brands LLC | ($271,883.39) | deposited into Citibank acct# 3290398299 |

Cash sources per CAFRA Petition Addendum dated Aug 19, 2019:

| | |
|---|---|
| Migna Colon personal savings | 35,000 |
| Jpizle Kitchen cash receipts | 57,000 |
| Mark Anthony Figueroa personal savings | 8,000 |
| | $100,000 |

**Calculation of cash earnings per CAFRA Petition Addendum:**

Migna Colon savings (cash rent)

| | |
|---|---|
| Jose Rivera rent ($2,000 per mo x 2.5 yrs) | 60,000 |
| Israel Pabon rent ($950 per mo x 2 yrs) | 22,800 |
| | $82,800 |

**Cash deposits into Migna Colon Pabon bank accounts:**
**(Jan 2017 - April 18, 2019)**

| | |
|---|---|
| BoA *8261 | 37,645 |
| Eastern Bank *9769/*8710/*5282 | 160,370 |
| | $198,015 |

**Calculation of cash earnings per CAFRA Petition Addendum:**

Jpizle Kitchen cash receipts

| | | |
|---|---|---|
| Cash receipts (Jun 2018 - Sep 24, 2018) | 52,527 | * |
| Cash receipts (Sep 25, 2018 - Dec 31, 2018) | 30,801 | *19.16%* |
| Cash receipts (Jan 1, 2019 - Apr 17, 2019) | 34,450 | *19.91%* |
| | $117,778 | |

* - Estimated based on 20% of $262,635 gross receipts per 2018 tax return

**Cash deposits into Jpizle bank accounts:**
**(May 2018 - April 18, 2019)**

| | |
|---|---|
| Rockland Trust *4402/*6602/*7939 | $128,725 |

**GA: 3**



WSC Fedex World Service Center
1319 N Industrial Dr
Nogales, AZ



455 Commanche Cir
Harvard, IL
*Place of pickup: Tucson, AZ*

14071B NE 200th St
Woodinville, WA
*Place of pickup: Tucson, AZ*

**Various address in Watertown MA**
- 30 shipments (July 2017 – Jan 2019)
- Average weight per package = 8.6 lbs
- 25 shipments had delivery scans by Rojas or Carrasco
- 4 shipments found in Figueroa phone extraction

**Various address in Watertown or Cambridge MA**
- 10 shipments (Aug 2018 – Aug 2019)
- Average weight per package = 7.7 lbs
- All shipments had delivery scans by Carrasco
- FedEx label with same sender address found in Figueroa phone extraction

**Various address in Cambridge MA**
- 5 shipments (May 2019– Aug 2019)
- Average weight per package = 5.7 lbs
- 4 shipments had delivery scans by Carrasco
- 2 shipments found in Figueroa phone extraction
- 2 shipments seized by law enforcement



| FedEx Tracking # | Ship Date | Delivery Date | Weight (lbs) | Delivered By | Receiver Name | Receiver Address |
|---|---|---|---|---|---|---|
| 787450540162 | 05/23/19 | 5/29/2019 9:33 | 7.7 | CARRASCO | Lily Davis, Harvard Yard | 1 Oxford St, Cambridge, MA 02138 |
| 787450569882 | 05/23/19 | 5/31/2019 11:26 | 7.2 | CARRASCO | Michael Mandler, Harvard University | 12 Oxford St, Cambridge, MA 02138 |
| 787530231377 | 05/28/19 | 6/4/2019 11:57 | 1.6 | CARRASCO | Vadim Baidin, Harvard University | 12 Oxford St, Cambridge, MA 02138 |
| 787679813492 | 06/04/19 | 6/11/2019 10:23 | 7.1 | 7356720 | Dan Hoer, Harvard University | 16 Divinity Ave, Cambridge, MA 02138 |
| 788796497154 | 07/30/19 | 8/6/2019 11:35 | 4.8 | CARRASCO | Mr. Henry Spencer | 1000 Mass Ave, Cambridge, MA 02138 |

**GA: 4**